**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 6, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| RONALD LaASMAR and SANDRA LaASMAR, <br><br> Plaintiffs-Appellees-Cross-Appellants, <br><br> v. <br><br> PHELPS DODGE CORPORATION LIFE, ACCIDENTAL DEATH & DISMEMBERMENT AND DEPENDENT LIFE INSURANCE PLAN, a benefit plan provided by Phelps Dodge Corporation, a New York corporation, and METROPOLITAN LIFE INSURANCE COMPANY, <br><br> Defendants-Appellants-Cross-Appellees. | Nos. 07-1267, 07-1286 |

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 06-cv-00013-MSK-MJW)**

Jack M. Englert, Jr. (Michael S. Beaver of Holland & Hart LLP, Greenwood Village, CO, and Lowell D. Kass of Metropolitan Life Insurance Company, Long Island City, NY, with him on the briefs), Holland & Hart LLP, Greenwood Village, CO, for Defendants-Appellants-Cross-Appellees.

William D. Meyer, Hutchinson Black and Cook, LLC, Boulder, CO, for Plaintiffs-Appellees-Cross-Appellants.

Before **BRISCOE,** Chief Judge, **EBEL** and **MURPHY**, Circuit Judges.

**EBEL**, Circuit Judge.

"Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident. On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance." Landress v. Phoenix Mut. Life Ins. Co., 291 U.S. 491, 499 (1934) (Cardozo, J., dissenting) (quotations, citations omitted).

Plaintiffs Ronald and Sandra LaAsmar's adult son Mark had accidental death insurance as part of an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. In this case, we must decide whether Mark LaAsmar's death, in a one-vehicle crash, was the result of an "accident" covered under the plan. Defendant Metropolitan Life Insurance Company ("MetLife"), the plan's administrator, denied the LaAsmars' claim for accidental death benefits because, at the time of the crash, Mark LaAsmar's blood alcohol level was almost three times the limit permitted under Colorado law. The district court overturned that decision. Having jurisdiction under 28 U.S.C. § 1291 and reviewing MetLife's denial of benefits de novo, we AFFIRM.

## I. BACKGROUND

Mark LaAsmar began working for Phelps Dodge Corporation in January 2004. Through Defendant Phelps Dodge Corporation Life, Accidental Death and Dismemberment and Dependent Life Insurance Plan ("Plan"), LaAsmar obtained both life insurance and accidental death and dismemberment ("AD&D") coverage. The Plan contracted with Defendant Metropolitan Life Insurance Company ("MetLife") to provide these benefits; MetLife was also the Plan's claims administrator.

According to the terms of that Plan, Mark LaAsmar's AD&D insurance provided "additional security by paying [his] beneficiary a benefit in addition to life insurance if [he] die[d] as a result of an accident." (Aplt. App. at 81.) The accident had to be "the sole cause of the injury," "the sole cause of the covered loss," and "[t]he covered loss [had to] occur[] not more than one year after the date of the accident." (Id. at 82.)

In the early morning hours of July 25, 2004, LaAsmar died in a single-vehicle crash in Grand County, Colorado. His death certificate identified him as the "apparent driver" of the vehicle, a pickup truck owned by LaAsmar. (Id. at 179.) The vehicle's other occupant, Patrick O'hotto, also died in the crash. The Colorado State Patrol report on the incident indicated that, at the time of the crash, LaAsmar's truck was traveling sixty miles per hour on a straight two-lane rural road where the posted speed limit was forty miles per hour. The truck

3

traveled off the right side of the road and rolled four and one-quarter times. Neither occupant was wearing a seat belt; they were both ejected from the vehicle and were pronounced dead at the scene. LaAsmar's death certificate indicated that the "immediate cause" of his death was "[h]ead and internal injuries" which were due to "[b]lunt force trauma" as a consequence of an "MVA," or motor vehicle accident. (Id. at 179.) It was the opinion of the Colorado state trooper investigating the crash that alcohol was involved. And the toxicology report indicated that LaAsmar had a blood alcohol content ("BAC") of 0.227g/100 ml, which is almost three times Colorado's legal limit of .08, see Colo. Rev. Stat. §42-4-1301(2)(a).

Mark LaAsmar's parents, Plaintiffs Ronald and Sandra LaAsmar, were his beneficiaries. They filed a claim with MetLife for life and AD&D benefits. MetLife paid the LaAsmars life insurance benefits, but denied AD&D benefits for several reasons: 1) because Mark LaAsmar's extreme intoxication contributed to the crash, the motor vehicle "accident" was not the "sole cause" of his death; 2) because the crash was the reasonably foreseeable result of driving while intoxicated, it was not an "accident" covered under the Plan; and 3) these circumstances fell within the Plan's exclusion from AD&D coverage for a "loss caused by or contributed to by . . . [i]njuring oneself on purpose" (Aplt. App. at 83).

The LaAsmars then filed suit for breach of contract in Colorado state court,

4

naming both the Plan and MetLife as defendants. Defendants removed the action to federal court, asserting ERISA preemption; the parties now agree that ERISA governs the lawsuit, and we therefore construe the LaAsmars' suit as a private civil enforcement action to recover benefits under a plan, pursuant to 29 U.S.C. § 1132(a)(1)(B).[1] Both sides moved for summary judgment, stipulating that "no trial [was] necessary and that the Court should determine the Plaintiffs' claim based solely upon the administrative record before the Court." (Aplt. App. at 39).[2] Reviewing de novo MetLife's decision to deny AD&D benefits, the district court reversed that determination after concluding, among other things, that Mark LaAsmar's crash did constitute an "accident" under the Plan. (Id. at 47-48.)

In appeal No. 07-1267, MetLife and the Plan timely appeal the district court's order requiring that accidental death benefits be paid to the LaAsmars. The LaAsmars cross-appeal, No. 07-1286, from the district court's failure to rule on their requests for an award of attorney's fees and prejudgment interest.

---

[1] 29 U.S.C. § 1132(a) provides: "A civil action may be brought--(1) by a participant or beneficiary--. . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

[2] Prior to the filing of the dispositive motions, the magistrate judge handling pretrial matters permitted limited discovery, over Defendants' objection that the district court's decision should be made solely on the administrative record. MetLife and the Plan appealed the magistrate judge's decision, which the district court affirmed. While MetLife and the Plan continue to insist that the district court's decision should have been made only on the administrative record, they have not raised the issue on appeal because the district court's decision on the merits did not rely on the discovery to which they objected.

## II. AD&D BENEFITS

### A. Standard of Review

We review summary judgment orders de novo, using the same standards applied by the district court. See Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825 (10th Cir. 2008). Where, as here, the parties in an ERISA case both moved for summary judgment and stipulated that no trial is necessary, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (internal quotation omitted). Further, we accord no deference to the district court's decision. See Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 380 (10th Cir. 1992).

"Like the district court, we must first determine the appropriate standard to be applied to [MetLife's] decision to deny benefits." Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010 (10th Cir. 2008). We determine de novo what that standard should be. See Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1315 (10th Cir. 2009).

"[A] denial of benefits" covered by ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989). Where the plan gives the administrator discretionary authority, however, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." Weber, 541 F.3d at 1010 (internal citation, quotation omitted). Under this arbitrary-and-capricious standard, our "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." Kellogg, 549 F.3d at 825-26 (internal alterations, quotations omitted). As the party arguing for the more deferential standard of review, it is MetLife's burden to establish that this court should review its benefits decision at issue here under an arbitrary-and-capricious standard. See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 575 (2d Cir. 2006).

### 1. Whether procedural irregularities warrant de novo review

The district court held that the terms of the Plan did not delegate discretion to MetLife to make benefits decisions.[3] This presents a difficult question, but one we need not decide. Assuming, without deciding, that the Plan vested MetLife with such discretion, there were "procedural irregularities" here—MetLife's failure to comply with ERISA-mandated time limits in deciding the LaAsmars' administrative appeal—that require us to apply the same de novo review that would be required if discretion was not vested in MetLife.

---

[3]The record includes only the Summary Plan Documents ("SPD"), and the parties have litigated this case solely based on the SPD.

The LaAsmars filed their claims with MetLife on September 8, 2004, seeking life and AD&D benefits. MetLife initially denied the claim for AD&D benefits in a letter dated October 19, 2004.

The Plan explicitly provided that the LaAsmars could administratively appeal that decision to MetLife, giving them sixty days from the receipt of the initial denial to do so. The LaAsmars timely sought an administrative appeal with MetLife in a letter dated December 7, 2004.

The Plan further provided that, having received a request for an administrative appeal, MetLife "will review [the] claim and write to [the claimant] with its final and binding decision within 60 days of receiving [the] review request letter," or in this case, by approximately February 4, 2005.[4] (Aplt. App. at 89.)

The Plan's sixty-day deadline for MetLife to decide the LaAsmars' administrative appeal stems from ERISA's requirement that, "[i]n accordance with regulations of the Secretary [of Labor], every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2); see Aetna Health Inc. v. Davila, 542 U.S. 200, 220 (2004). The Secretary's regulations

---

[4]MetLife's October 19, 2004 letter to the LaAsmars initially denying their AD&D claim reiterated this sixty-day deadline for MetLife to respond to any administrative appeal.

implementing that "reasonable opportunity" for review obligation require, among other things, that "the plan administrator . . . notify a claimant . . . of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review by the plan."  29 C.F.R. § 2560.503-1(i)(1)(i) (2002).

In this case, however, MetLife did not decide the LaAsmars' administrative appeal until May 26, 2005, 170 days after they had sought review, or more than three times as long as permitted under the terms of the Plan and the ERISA regulations.[5]

This court has on several occasions reviewed a benefits denial de novo, notwithstanding the fact that the Plan afforded the administrator discretion to make benefits determinations, where there were procedural irregularities in the administrator's consideration of the benefits claim.  Applying an earlier version of 29 C.F.R. § 2560.503-1(h)(4) (1998), this court first applied de novo review based upon the insurer's breach of its duty to deliver a timely administrative decision in Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631 (10th Cir. 2003).

---

[5]The relevant regulation does permit the plan administrator to extend this time period another sixty days if "special circumstances (such as the need to hold a hearing)," require it.  29 C.F.R. § 2560.503-1(i)(1)(i) (2002).  But "[i]n no event shall such extension exceed a period of 60 days from the end of the initial period."  Id.  The terms of the Plan also include the possibility of such an extension.  In this case, however, MetLife never asserted that there were any "special circumstances" that might have warranted an extension, nor did MetLife ever formally seek such an extension.  Even if it had, however, MetLife's administrative appeal determination would still have been fifty days late.

In Gilbertson, the insurer never decided the claimant's administrative appeal. See id. at 628-29. Notwithstanding that fact and well after the expiration of the sixty-day time limit, the claimant filed suit under ERISA challenging the denial of her claim. See id. at 629-30. The claimant did so relying on the version of 29 C.F.R. § 2560.503-1(h)(4) in effect at that time, which provided that when an administrator's appeal decision was not timely furnished, the claim would be "deemed denied." Gilbertson, 328 F.3d at 629-30. In that case, despite the fact that the terms of the plan at issue vested the insurer with discretion to determine benefits, we reviewed the Plan's denial of benefits de novo because "the administrator's 'deemed denied' decision [occurred] by operation of law rather than [by the administrator's] exercise of discretion." Id. at 631. Gilbertson, thus, held that "deferential review," where it was otherwise warranted, only applies "in those instances where an administrator's decision is an [actual] exercise of 'a discretion vested in [it] by the instrument under which [it] act[s].'" Id. (quoting Firestone, 489 U.S. at 111 (internal quotations and emphasis omitted)). Gilbertson's holding was based on the sensible notion that an ERISA "plan administrator is not entitled to the deference of arbitrary and capricious review when [the administrative] appeal[] [was] 'deemed denied' because the administrator made no decision to which a court may defer." Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 379 F.3d 1168, 1173 (10th Cir. 2004).

The Secretary of Labor revised 29 C.F.R. § 2560.503-1, effective in 2002, and that revised version of this regulation applies here. The revision eliminated the "deemed denied" language and now the regulation instead provides that,

> [i]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act [29 U.S.C. § 1132(a)] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l) (2002) (emphasis added). This regulation, like its predecessor, protects a claimant by insuring that the administrative appeals process does not go on indefinitely. See Gilbertson, 328 F.3d at 635-36.

Recently, this court, applying the revised 29 C.F.R. § 2560.503-1(l) but relying on the reasoning first expressed earlier in Gilbertson, employed a de novo standard of review in another case where the administrator never issued any decision on the claimant's administrative appeal. See Kellogg, 549 F.3d at 827-28. In Kellogg, this court applied a de novo standard of review under those circumstances, notwithstanding that the plan at issue vested "sole discretion" in the plan administrator to determine benefits eligibility. Id. at 826-28.

Unlike in Gilbertson and Kellogg, however, in this case MetLife did issue a decision denying the LaAsmars' administrative appeal, a decision to which this court potentially could defer; however, MetLife issued that decision in a belated manner. Under these circumstances, we still decline to apply a deferential

11

standard of review; instead, we will review MetLife's benefits denial de novo.

The facts of our case are similar to those presented in Rasenack. In that case, we applied a de novo standard of review under the new version of 29 C.F.R. § 2560.503-1(l) (2002), even though the administrator eventually but belatedly issued a decision denying a claimant's administrative appeal, albeit after the claimant had already filed suit under ERISA. See Rasenack, 585 F.3d at 1314-18. Importantly, we noted that "[t]he relevant fact is that the administrator failed to 'render a final decision within the temporal limits' prescribed by the Plan and ERISA." Id. at 1318 (quoting Gilbertson, 328 F.3d at 631; alteration omitted). In Rasenack, we further noted that

> permitting plan administrators to avoid de novo review by belatedly denying an appeal after the deadline has passed and the claimant has filed suit would conflict with the ERISA's stated purposes, namely "protect[ing] . . . the interests of participants in employee benefit plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."

Id. at 1318 (quoting 29 U.S.C. § 1001(b)).

That same reasoning applies here. Although MetLife eventually denied the LaAsmars' claim on administrative review, it did so substantially outside the time period within which the Plan vested it with discretion to interpret and apply the Plan. Thus, it was not acting within the discretion provided by the Plan. See Gilbertson, 328 F.3d at 631.

12

Our conclusion is bolstered by the Department of Labor's indication, in revising § 2560.503-1(l), that it intended "to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections <u>should not be entitled to any judicial deference</u>." Pension and Welfare Benefits Administration, 65 Fed. Reg. 70246-01, 70255 (Nov. 21, 2000) (emphasis added).[6]

---

[6]Citing to <u>Finley</u>, MetLife argues that it is still entitled to deferential review of its denial of the LaAsmars' AD&D claim because the LaAsmars did not provide any meaningful new evidence nor raise any significant new issues in their request for an administrative appeal. In both <u>Gilbertson</u> and <u>Finley</u>, the administrator failed to address a claimant's administrative appeal in a timely manner and so that appeal was "deemed denied" under the earlier version of 29 C.F.R. § 2560.503-1. <u>See</u> <u>Finley</u>, 379 F.3d at 1172; <u>Gilbertson</u>, 328 F.3d at 631 & n.4. While <u>Gilbertson</u> declined to afford deferential review to the "deemed denied" decision, because the administrator had never actually exercised its discretion, <u>see</u> 328 F.3d at 631, <u>Finley</u> did afford more deferential review because there the administrator had exercised its discretion in initially denying the claim, and the claimant, in requesting an administrative appeal, failed to present either meaningful new evidence or significant new issues on administrative appeal, <u>see</u> 379 F.3d at 1174-75. <u>Finley</u> afforded more deferential review after concluding we already knew what reasoning and ultimate decision the administrator's exercise of discretion would have produced on administrative appeal—the same reasoning and result the administrator stated earlier in the initial claim denial. <u>See id.</u> (applying <u>McGarrah v. Hartford Life Ins. Co.</u>, 234 F.3d 1026, 1031 (8th Cir. 2000), <u>abrogation on other grounds recognized by</u> <u>Chronister v. Unum Life Ins. Co. of Am.</u>, 563 F.3d 773, 775 (8th Cir. 2009)).

We are reluctant to extend <u>Finley</u> because ERISA recognizes the value of an administrator's timely second look at a claim on administrative appeal, even if no new facts or legal arguments are advanced. Nevertheless, even accepting <u>Finley</u>, as we must, <u>Finley</u> is inapposite here because in this case the LaAsmars did raise significant new issues in their request for administrative review, including their arguments that their son was not driving at the time of the crash, that even if he was driving, there was no evidence that his intoxication caused the

(continued...)

13

## 2. Whether MetLife's substantial compliance with these procedural requirements permits it to avoid de novo review

MetLife argues that, despite these procedural irregularities, it substantially complied with the requirements for a timely administrative appeal. Under our earlier precedent applying the pre-2002 version of 29 C.F.R. § 2560.503-1, this court declined to apply "a hair-trigger rule" requiring de novo review whenever the plan administrator, vested with discretion, failed in any respect to comply with the procedures mandated by this regulation. See Finley, 379 F.3d at 1173. Instead, if this court concluded that the administrator's decision was in "substantial compliance" with ERISA deadlines, then, if otherwise warranted, we would still afford deference to the benefits decision. See id. at 1173-75 (applying deferential arbitrary-and-capricious standard of review notwithstanding that administrative appeal was "deemed denied" and thus administrator did not exercise discretion in ruling on claimant's appeal); see also Gilbertson, 328 F.3d at 634-35. We need not decide whether that "substantial compliance" doctrine still applies to the revised regulation at issue here, 29 C.F.R. § 2560.503-1, because even assuming it does apply, MetLife did not substantially comply here with ERISA's requirement of a timely resolution of an administrative appeal.[7] In

---

[6](...continued)
wreck, and that their AD&D claim should be analyzed under Wickman v. Northwestern National Insurance Co., 908 F.2d 1077 (1st Cir. 1990).

[7]In Kellogg, we left open the question of whether the "'substantial
(continued...)

14

our cases addressing the prior regulation, we stated that an administrator

substantially complied if the procedural irregularity was "(1) 'inconsequential';

and (2) in the context of an on-going, good-faith exchange of information

between the administrator and the claimant." Finley, 379 F.3d at 1174 (quoting

Gilbertson, 328 F.3d at 635); see also Rasenack, 585 F.3d at 1317. Assuming,

without deciding, that that test would apply under the revised regulation, MetLife

has failed to meet it because the 170-day delay in this case did not occur within

"the context of an on-going, good-faith exchange of information between the

administrator and the claimant." Finley, 379 F.3d at 1174 (quoting Gilbertson,

328 F.3d at 635). MetLife never requested an extension of time, as 29 C.F.R.

§ 2560.503-1(i)(1)(i) permits. And there is no suggestion in the record that

Metlife was, during this delay, engaged in "an on-going productive

evidence-gathering process in which the claimant is kept reasonably

_____

[7](...continued)
compliance' rule" remains applicable under the revised 2002 ERISA regulations, because in Kellogg, even if the "substantial compliance rule" still applied, there was no doubt there that "MetLife was not in 'substantial compliance' with the ERISA deadlines" because the administrator in that case never issued any decision on the claimant's administrative appeal. 549 F.3d at 825, 827-28; see also Hancock v. Metro. Life Ins. Co., 590 F.3d 1141, 1152 n.3 (10th Cir. 2009) (noting that, because claimant "failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA"); Rasenack, 585 F.3d at 1316-17 (noting that, because the administrator failed the substantial compliance test, this court did not need to decide whether "a minor violation of the deadlines or other procedural irregularities would entitle the claimant to de novo review under the 2002 amendments").

15

well-informed as to the status of the claim and the kinds of information that will satisfy the administrator." Gilbertson. 328 F.3d at 636. Instead, in response to the LaAsmars' attorney's letter asking about their administrative appeal, MetLife indicated only that it was still evaluating the case. It does not appear that MetLife ever attempted to gather any additional evidence before eventually denying the LaAsmars' administrative appeal.

For these reasons, we will review MetLife's decision to deny the LaAsmars' claim for AD&D benefits de novo because MetLife failed to comply substantially with 29 C.F.R. § 2560.503-1(i)(1)(i)'s deadline for deciding a claimant's administrative appeal.

## B. Whether MetLife erred in denying the LaAsmars' claim for AD&D benefits

We, thus, review de novo both the interpretation of the terms of the Plan and MetLife's decision to deny the LaAsmars accidental death benefits. See Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1250 (10th Cir. 2007). It was the LaAsmars' burden to establish a covered loss. See Rasenack, 585 F.3d at 1319.

The AD&D Plan at issue here, like any insurance policy, is a contract, an agreement between the Plan and its participant. See Salisbury v. Hartford Life & Accident Co., 583 F.3d 1245, 1247 (10th Cir. 2009). In interpreting that agreement, we must determine the parties' intent at the time they entered into it.

16

See Blair v. Metro. Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992). Because an insurance policy is drafted by the insurer, however, our inquiry is not what the provider unilaterally intended the terms of the Plan to mean, but what a reasonable person in the position of the participant would have understood those terms to mean. See Rasenack, 585 F.3d at 1318.

In reviewing MetLife's decision to deny benefits, we are limited to considering only the rationale given by MetLife for that denial. See Kellogg, 549 F.3d at 828-29. We turn, then, to the three reasons why MetLife denied the LaAsmars' claim for AD&D benefits.

### 1. Whether the crash was the "sole cause" of Mark LaAsmar's death

The first reason that MetLife denied the LaAsmars' claim for AD&D benefits was because MetLife concluded that "the crash was not the sole cause of the loss," as required by the policy (Aplt. App. at 82). MetLife concluded that Mark LaAsmer's "extreme intoxicated state was a contributing factor." (Id. at 103-04.)

We rejected this same reasoning in Kellogg v. Metropolitan Life Insurance Co., 549 F.3d 818 (10th Cir. 2008). In Kellogg, the insured was killed in a car wreck. See id. at 819-20. Based upon an eyewitness's testimony and the insured's prescription medications, it appeared that the wreck may have occurred because the insured had a seizure while driving. See id. at 819-21. Similar to the

17

Plan at issue here, the plan in Kellogg provided for AD&D benefits if the accident was "the Direct and Sole Cause of a Covered Loss . . . mean[ing] that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes." Id. at 821 (quotation omitted). But that plan excluded from AD&D coverage "any loss caused or contributed to by . . . physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity." Id. (quotation omitted). In Kellogg, MetLife denied AD&D benefits because "[t]he decedent's physical illness, the seizure, was the cause of the crash." Id. at 823 (quotation omitted).

This court, reviewing the denial of benefits de novo, applying the "plain meaning" of the language of the plan, and construing the terms strictly against the insurer, reversed. See id. at 828-33.

> Here, the loss (Brad Kellogg's death) was caused by a skull fracture resulting from the car accident, not by physical or mental illness. . . . While the seizure may have been the cause of the crash, it was not the cause of Brad Kellogg's death. The Plan does not contain an exclusion for losses due to accidents that were caused by physical illness, but rather excludes only losses caused by physical illness. Because there is no evidence that the seizure caused Brad Kellogg's death, MetLife's argument fails.

> The fact that the policy at issue here excludes losses that were caused or contributed to by physical illness does not change this analysis. A reasonable policyholder would understand this language to refer to causes contributing to the death, not to the accident.

Id. at 832-33 (citations, footnote omitted); see also Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 998-1000, 1009-10 (10th Cir. 2004) (per curiam) (holding,

on rehearing, that exclusion for disabilities caused by a pre-existing medical condition would not support denial of benefits caused by staph infection resulting from surgery for a pre-existing condition), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 2351 (2008).

Kellogg's reasoning applies here as well. Mark LaAsmar died, not of alcohol intoxication, but as a result of head and internal injuries suffered in a motor vehicle crash. The sole cause of the loss, Mark LaAsmar's death, was the crash.

### 2. Whether the crash was an "accident" as provided in the Plan

The second reason MetLife denied the LaAsmars AD&D benefits was because it concluded Mark LaAsmar's death was not the result of an "accident": "Here, the decedent's BAC was over two times the lawful limit. Driving while so impaired rendered the infliction of serious injury or death reasonably foreseeable and hence, not accidental as contemplated by the Plan." (Aplt. App. at 103.)

#### a. Declining to adopt a per se rule

As a starting point, the LaAsmars argue that MetLife erred by denying their AD&D claim based upon a blanket rule that all wrecks occurring while the driver has a BAC of approximately 2.8 times the legal limit is not an "accident." Courts have consistently rejected such a per se rule, as would we. See Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 91 & n.9 (1st Cir.) (rejecting "categorical determination that all alcohol-related deaths are per se accidental or

19

nonaccidental"), cert. denied, 129 S. Ct. 636 (2008); Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 621 (6th Cir. 2007) (noting that "the extent of the risk" a drunk driver takes will "vary from case to case, depending on how intoxicated the driver is, how far he drives, how fast he drives, and how many other drivers and pedestrians are sharing the road with him") (quotation omitted) (opinion of Rogers, J.); Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 345, 347 (4th Cir. 2006) (rejecting such a per se rule); Cozzie v. Metro. Life Ins. Co., 140 F.3d 1104, 1106, 1110 (7th Cir. 1998) (affirming denial of AD&D benefits where insured died while driving drunk, but expressly not suggesting that insurer "could sustain a determination that all deaths that are causally related to the ingestion of alcohol . . . could reasonably be construed as not accidental"); Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of N. Am., 659 F. Supp. 2d 318, 326-27 (D. Conn. 2009) (holding plan administrator's denial of benefits was arbitrary and capricious because the administrator in effect applied a per se rule treating all drunk driving deaths as non-accidental). MetLife's assertion, in its decision denying the LaAsmars' administrative appeal, that driving while as drunk as Mark LaAsmar was—almost three times the legal limit for BAC—makes serious injury or death reasonably foreseeable and thus not accidental, suggests that MetLife was applying such a per se rule based solely upon the degree of intoxication involved. We reject this interpretation of this AD&D policy.

          **b.**       **Whether a reasonable person in Mark LaAsmar's position**

20

**would have understood the term "accident," as used in this AD&D Plan, to cover the crash at issue here**

We must determine, then, what the parties, in making an agreement for AD&D coverage, intended to include under the term "accident."[8]  As previously noted, our inquiry must focus on what a reasonable person, in Mark LaAsmar's position, would have understood the terms of the AD&D policy to mean.  See Rasenack, 585 F.3d at 1318.  In making that determination, we look to the language of the Plan, which provided AD&D benefits "if [the insured's] death is due to an accident."  (Aplt. App. at 75.)  The Plan explained that "AD&D insurance provides additional security by paying [the insured's] designated beneficiary a benefit in addition to life insurance if [the insured] die[s] as a result

---

[8]At the outset of this discussion, we note that what we address here are the terms of an agreement between MetLife and the insured, Mark LaAsmar, for AD&D coverage.  That question does not implicate policy concerns about drunk driving or the risk a drunk driver presents to others.  See Douglas R. Richmond, "Drunk in the Serbonian Bog: Intoxicated Drivers' Deaths as Insurance Accidents," 32 Seattle U. L. Rev. 83, 121-22 (Fall 2008) (noting that it is the legislature's "criminalization of drunk driving" that focuses on the risk that drunk drivers pose to others).  "Resolving accident questions for insurance purposes by reference to societal norms or to advance the public policy of deterring undesirable or illegal behaviors leads to inconsistent, and often unfair, results." Douglas R. Richmond, "Drugs, Sex, and Accidental Death Insurance," 45 Tort Trial & Ins. Prac. L.J. 57, 59 (Fall 2009).  Here, the only question at issue is whether, when Mark LaAsmar agreed to participate in MetLife's AD&D coverage, he would have reasonably believed that, should he die in a vehicular crash under the circumstances at issue here, MetLife would pay his beneficiaries AD&D benefits.  See Kovach V. Zurich Am. Ins. Co., 587 F.3d 323, 330 (6th Cir. 2009) (noting that, although "drunk driving is ill-advised, dangerous, and easily avoidable," courts must "refrain from allowing our moral judgments about drunk driving to influence our review of the [plan administrator's] interpretation of the relevant Plan provisions").

of an accident." (Id. at 81.) The Plan further provided that "[a]n additional [AD&D] benefit may be payable if the loss of [an insured's] life results from injuries sustained while driving or riding in a private passenger car if [the insured's] seat belt was properly fastened." (Id. at 83.) And the Plan excluded from AD&D coverage "death . . . caused by or contributed to by" a number of things, including "[s]uicide or any attempt at suicide," and "[i]njuring oneself on purpose."[9] (Id.) The Plan however, did not define the word "accident," even though it is the crucial term underlying the AD&D coverage provided.

Judged in the context of the policy as a whole, see Weber, 541 F.3d at 1011, and speaking generally, a reasonable person in Mark LaAsmar's position would have understood from the language of the Plan that the term "accident" did not include any conduct intentionally causing a loss. And the fact that there might be an additional benefit paid for wearing a seat belt would suggest to a reasonable person that the standard AD&D benefits would be available, even if the plan participant did not take affirmative action to minimize the risks he

_____

[9]More specifically, the Plan excluded from AD&D coverage "death . . . caused by or contributed to by:" 1) "[d]iagnosis or treatment of a physical or mental illness;" 2) "[i]nfection, except from an accidental cut or wound;" 3) "[s]uicide or any attempt at suicide;" 4) "[i]njuring oneself on purpose;" 5) "[t]he use of any drug or medicine;" 6) "[t]aking part in a felony, serious crime or assault;" 7) "[w]ar, or warlike action, in time of peace, including terrorist acts;" 8) "[a]ny poison or gas voluntarily taken, administered or absorbed;" 9) "[s]ervice in the armed forces of any country or international authority, except in the United States National Guard;" and 10) "[a]ir travel as a pilot or crew member." (Aplt. App. at 83-84.)

22

undertook. Beyond those clues, derived from the plan's language, about what the parties intended "accident" to mean, however, we are left to determine what a reasonable person in Mark LaAsmar's position would have understood by the term "accident." Rasenack, 585 F.3d at 1318.

In making that determination, we must first consider whether that term as the Plan used it is ambiguous under the circumstances presented here. See id. In doing so, we again consider the common and ordinary meaning of the word, as a reasonable person in the position of the participant would understand it. See id. In that light, a term is ambiguous if it "is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." Id. (quotation omitted).

Surely there can be no question in this case that the term "accident," as used in this Plan and as applied to this case, is ambiguous.[10] See Stamp, 531 F.3d

_____

[10]In Pirkheim v. First Unum Life Insurance Co., 229 F.3d 1008, 1009-10 (10th Cir. 2000), this court held that the phrase "directly and independently of all other causes from accidental bodily injury," under the circumstances at issue there, was not ambiguous. That case, however, is distinguishable from the case at issue here. In Pirkheim, the insured was a four-year-old boy who was dependent on a pacemaker to regulate the beating of his heart, after he had suffered nerve damage during surgery that successfully repaired a congenital heart defect. See id. at 1008-09. The boy died after the battery for his pacemaker became depleted. See id. at 1009. The question presented in Pirkheim was whether the boy's death "'result[ed] directly and independently of all other causes from accidental bodily injury.'" Id. (quoting AD&D policy; emphasis omitted). As part of its analysis, this court held that the language of that phrase was not ambiguous, but did so focusing on the terms "directly" and "independently." Id. at 1010-11 (quotations omitted). More importantly, whether a term or phrase is ambiguous must be
(continued...)

23

at 88 (deeming "accident," as used in an AD&D policy applied to insured's drunk driving, to be ambiguous); Sanchez v. Life Ins. Co. of N. Am., No. SA-08-CV-527-XR, 2009 WL 3255160, at *6 (W.D. Tex. Oct. 6, 2009) (in addressing AD&D benefits for death occurring in vehicular crash while insured was driving drunk, treating the policy's use of the term "accident," defined as a "'sudden, unforeseeable, external event,'" as ambiguous); Mullaney v. Aetna U.S. Healthcare, 103 F. Supp. 2d 486, 488, 491 (D.R.I. 2000) (noting, in case addressing whether AD&D benefits should be awarded after insured died in vehicular crash while driving drunk, "that the word 'accident,' when used in the context of an insurance policy, does not have a plain and ordinary meaning"); see also Wickman, 908 F.2d at 1087 (in addressing whether a fall from bridge was an "accident" for purposes of AD&D insurance, noting that "[c]ase law is fairly consistent in defining an accident, using equally ambiguous terms such as undesigned, unintentional, and unexpected"); Lennon, 504 F.3d at 627 & n.2

---

[10](...continued)
considered in light of the question at issue in a given situation. See Casey v. Uddeholm Corp., 32 F.3d 1094, 1097 (7th Cir. 1994) (noting that, "[w]hile 'accidentally' may be unambiguous in other contexts, we agree that it is ambiguous here in light of the specific facts of this case"); 2 Eric M. Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, § 5.4 at 89 (2d ed. 1996) (noting that "the fact that the terms of a policy may be construed as ambiguous when applied to one set of facts does not make them ambiguous as to others which come directly within the purview of such terms"). Pirkheim did not involve the issue before us, which is whether a wreck incurred by a drunk driver with a BAC of almost three times the legal limit is not unambiguously included within the ordinary and reasonable interpretation of "accidental" death coverage.

24

(Clay, J., dissenting) (noting, in addressing AD&D coverage for insured's drunk driving, that "the barrage of case law" on the question of the "ordinary" meaning of the term "accident" "suggests that the meaning of 'accidental' is anything but plain"); West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 860, 880 (N.D. Iowa 2001) (noting, in case addressing whether insured's death in a car crash was accidental for AD&D coverage, that, "[u]nfortunately, there is probably no 'ordinary' meaning of 'accident' upon which all reasonable people could agree"); Fegan v. State Mut. Life Assurance Co. of Am., 945 F. Supp. 396, 397, 399 (D.N.H. 1996) (noting, in case addressing whether death due to complications from surgery was the result of an accident, that "[w]hat generally qualifies as an 'accident,' as that term is used in policies providing insurance against accidental death, appears to be one of the more philosophically complex simple questions"). See generally Richmond, 45 Tort Trial & Ins. Prac. L.J. at 58, 63 (noting that "the terms accident and accidental are incredibly elusive," and that "few issues so confound courts as determining when deaths are to be considered accidents for purposes of insurance policies affording accidental death coverage"); Gary Schuman, "Dying Under the Influence: Drunk Driving and Accidental Death Insurance," 44 Tort Trial & Ins. Prac. L.J. 1, 2 (Fall 2008) (noting that courts and insurance underwriters, for 150 years, "have attempted to answer th[e] apparently simply question" of "what is an 'accidental bodily injury'"; further noting that "[t]here probably is no 'ordinary' meaning of 'accident' upon which everyone can

25

agree, at least in the context of accidental death insurance or benefit plans"). But

cf. McLain v. Metro. Life Ins. Co., 820 F. Supp. 169, 170-71, 176 (D.N.J. 1993)

(holding, in case addressing whether acute reaction to cocaine was an "accident"

for purposes of AD&D benefits, term "accident" as used in the AD&D policy was

not ambiguous).

Because we are reviewing MetLife's denial of benefits de novo and because

we conclude that the term "accident," as used in the Plan at issue in this case, is

ambiguous, "[t]he doctrine of contra proferentem, which construes all ambiguities

against the drafter, applies" here.[11] Rasenack, 585 F.3d at 1318 (quotation

omitted). This is because "ERISA imposes upon providers a fiduciary duty

similar to the one trustees owe trust beneficiaries. Just as a trustee must conduct

his dealings with a beneficiary with the utmost degree of honesty and

transparency, an ERISA provider is required to clearly delineate the scope of its

obligations." Id. at 1318-19 (quotation omitted). We also strictly construe

insurance contracts against the insurer, in light of the unequal bargaining position

of the parties. See Kellogg, 549 F.3d at 830. Applying the doctrine of contra

proferentem and "[s]trictly construing ambiguous terms presents ERISA providers

with a clear alternative: draft plans that reasonable people can understand or pay

---

[11]"Where a plan's language is ambiguous on its face, courts may [also] turn to extrinsic evidence of [the] parties' intent . . . ." Miller, 502 F.3d at 1253 (quotation omitted). Here, however, none of the parties point to any extrinsic evidence that might explain what they intended by "accident."

26

for ambiguity." Rasenack, 585 F.3d at 1320 (quotation omitted); see also Miller, 502 F.3d at 1254.

It is not too much to ask of ERISA insurers to set forth explicitly what is and is not an accident covered by their AD&D policy, and to state unambiguously whether death and disability caused by the insured's drunk driving is an accident and, if not, to include a workable definition of drunkenness and of causation attributed to such drunkenness. See Miller, 502 F.3d at 1254 (noting that "ERISA . . . gives significant benefits to providers by preempting many state law causes of action which threaten considerably greater liability than that allowed by ERISA" in return for "promot[ing] the interests of employees and their beneficiaries in employee benefits plans and . . . protect[ing] contractually defined benefits") (quotation, alterations omitted).

> Insurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. . . . [A]n insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

Id. at 1254-55 (quoting Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 540 (9th Cir. 1990)).

Here, then, in determining whether the crash at issue in this case was an "accident," we consider the common and ordinary understanding of the word

27

"accident," as a reasonable insured would understand the term, but in doing so we construe the meaning of that term in the LaAsmars' favor and against MetLife.[12] See generally Senkier v. Hartford Life & Accident Ins. Co., 948 F.2d 1050, 1052-53 (7th Cir. 1991) (in deciding whether "a medical mishap [is] an 'accident'" for purposes of accidental death benefits, rejecting other legal tests and instead "leav[ing] the question to common understanding as revealed in common speech"; further noting that "[a] lay person has a clear if inarticulate understanding of the difference between an accidental death and a death from illness, and that understanding will not be altered or improved by head-spinning judicial efforts at definition") (quotation omitted).[13]

Under the terms of the Plan, at the non-accident end of the spectrum, we expect, without deciding, that a reasonable person would think the following were

---

[12]This is an inquiry that courts are well suited to resolve. Courts make similar determinations in many different contexts. For instance, in tort cases a court may have to decide, as a matter of law, what a reasonable person knew or would have done under the circumstances presented in a given case. See Wagner v. Live Nation Motor Sports, Inc., 586 F.3d 1237, 1243-45 (10th Cir. 2009) (applying Kansas tort law to motion for judgment as a matter of law, under Fed. R. Civ. P. 50, on tort claim for wanton conduct), petition for cert. filed, (U.S. Feb. 26, 2010) (No. 09-1038); McDermott v. Midland Mgmt., Inc., 997 F.2d 768, 770-74 (10th Cir. 1993) (addressing summary judgment on negligence claim brought under Kansas law).

[13]In Senkier, the Seventh Circuit answered the question of whether "a medical mishap [is] an 'accident'" by asking, and deciding on its own, whether a "lay person" would suppose the death to have been an "accident." 948 F.2d at 1050, 1052-53.

28

not "accidents": if the insured intentionally caused the crash;[14] if the insured died as a result of playing Russian roulette;[15] or if an insured died in his vehicle while playing "chicken" with a train or another vehicle.

At the other end of the spectrum, we expect, again without deciding, that a reasonable person would generally believe that an insured did die in an "accident" if he lost control of his vehicle while talking on a cell phone or moderately speeding or becoming distracted by children in the back seat. See Eckelberry, 469 F.3d at 347 (noting that, in upholding administrator's denial of AD&D

---

[14]We do not adopt as broad a definition of "accident" as the district court did by concluding that "accident" as used in the Plan meant any event involving a motor vehicle.

[15]Our conclusion here is bolstered by the near unanimous consensus of courts reaching this same conclusion. Although statistics suggest that a person playing Russian roulette ordinarily has a one-in-six chance of dying (assuming they played just once), we are confident that a reasonable person would, nonetheless, conclude death while playing Russian roulette is not an accident. Stamp, 531 F.3d at 92-93 (noting that even though, "[f]rom a statistical standpoint, the likelihood of dying from a single round of Russian roulette is 16%—one in six," and thus "those who play Russian roulette have a decent chance, statistically speaking, of not being injured," nevertheless "such a death would not be publicly regarded as an accident") (quotation omitted); Eckelberry, 469 F.3d at 346 (noting that, "while an insured may not intend to die when he places a single cartridge into a pistol, spins the cylinder, places the gun to his forehead, and pulls the trigger, such a result is not just an unfortunate accident"); Wickman, 908 F.2d at 1087 (noting that, "[w]hen a person plays a game like Russian roulette and is killed, the death . . . would not be publicly regarded as an accident" and "[t]o allow recovery in such circumstances would defeat the very purpose or underlying function of accidental life insurance") (quotation omitted). This is no doubt due in part to the fact that a person engaged in Russian roulette is knowingly undertaking the risk of death solely for the sake of risk itself. See Kovach, 587 F.3d at 338 (noting that "playing Russian roulette has zero social utility").

benefits where insured died while driving drunk, court was not suggesting "that plan administrators can routinely deny coverage to insureds who engage in purely negligent conduct or, for example, to anyone that speeds"). To some degree, the language of the Plan at issue here providing for the possibility of additional benefits if the insured chose to wear a seat belt suggests that an insured's failure to take precautions against obvious dangers would not preclude AD&D benefits under this policy. Most people, in any event, would define accident to include many circumstances where a driver undertakes conduct that makes a crash more likely, such as driving when sleepy or when the weather is bad, talking on the cell phone, reaching for a compact disc, or turning to speak to a child while operating a vehicle. See Richmond, 32 Seattle U. L. Rev. at 85-86. Each of these volitional acts increases the probability of a wreck, some arguably to an even greater degree than driving drunk. See id. at 86 (commenting that a driver is more likely to have an accident if he is on his cell phone than if he is driving drunk); see also Kovach, 587 F.3d at 335-36. And yet, in each of these cases, reasonable people (and courts) generally consider a resulting wreck to be an "accident." See Richmond, 32 Seattle U. L. Rev. at 86 (noting that, although "[a]nother major contributor to vehicular crashes, 'distracted driving,' may result from cellular phone use, eating, listening to music, or personal grooming while behind the wheel," and "[t]he dangers of distracted driving are obvious[,] . . . a court is unlikely to find that a distracted driver's death is anything other than

30

accidental"); see also Kovach, 587 F.3d at 335-36. In fact, "[m]ost motor vehicle crashes are traceable to some failure of judgment that fully reveals its dangers only when it is too late. That is precisely why they are accidents." Richmond, 32 Seattle U. L. Rev. at 85 (quotation omitted). This is true even when a wreck is caused by an insured driver's arguably unlawful conduct, such as speeding or turning in front of oncoming traffic. See Eckelberry, 469 F.3d at 347; 10 Couch on Insurance § 139:13 (noting that "a large proportion of vehicular collisions involve the combination of an intentional act—turning, speeding, and so forth—with an unintended result—broadside collision, swerving and overturning, and so forth—yet are readily accepted as 'accidents'"); see also Kovach, 587 F.3d at 333 (noting carelessness or negligence of insured in running a stop light did not make the ensuing wreck not an accident, notwithstanding insured's BAC of .148).

Somewhere in the middle of this spectrum of circumstances falls Mark LaAsmar's decision to drive home in the early morning darkness on two-lane country roads, with a BAC of .227 and going sixty miles an hour in a forty-mile-per-hour zone. The same reasoning ought to apply to his situation as well. We believe that a reasonable person would believe that his death in a one-car rollover crash occurring during this drive was the result of an "accident" under the Plan at issue here.[16] See Kovach, 587 F.3d at 330 (noting that "drunk

_____

[16]Although not dispositive, our conclusion is bolstered by the fact that everyone involved in the investigation and aftermath of this single-vehicle crash,

(continued...)

driving is ill-advised, dangerous, and easily avoidable," but "so are many other activities that contribute to wrecks that a typical policyholder would consider 'accidental'"); see also id. at 333. In reaching this conclusion, we focus, not on the insured's motivations, but on his conduct. We focus not exclusively on the fact that Mark LaAsmar had a .227 BAC, because we have already rejected the application of a blanket per se rule denying coverage anytime an insured exceeds the legal BAC limits in the absence of explicit language in the Plan to that effect. Instead, here we focus on Mark LaAsmar's specific conduct, driving with a BAC of .227 early in the morning on a two-lane rural road, exceeding the posted speed limit by twenty miles per hour. A reasonable person would call the resulting rollover an "accident." That would be true whether Mark LaAsmar wrecked his truck because he fell asleep or lost control because he was speeding. It should also be true if he ran off the road because he had a BAC of .227. In our judgment, none of these circumstances is so extreme that a reasonable person would think they fell outside the realm of an "accident" sufficient to trigger payment of AD&D benefits. While we are not suggesting that there are no

---

[16](...continued)
including the investigating state trooper, the medical examiner and Mark LaAsmar's employer, called it an "accident." See Kovach, 587 F.3d at 333 (noting a witness reporting the crash at issue in that case "would almost certainly have reported that he or she had just seen an accident," and even the plan administrator that denied benefits "frequently referred to the crash as an accident in its own documentation"); see also Metro. Life Ins. Co. v. Potter, 992 F. Supp. 717, 730 (D.N.J. 1998).

circumstances where an insured would be so drunk that a resulting wreck could no longer be deemed an accident, see Schuman, 44 Tort Trial & Prac. L.J. at 61, (just as we are not prepared to suggest that there is no speed at which a motorist could drive which, under the circumstances, would take a resulting crash out of the realm of an accident), such are not the facts before us.[17]

Nor do we mean to suggest that drunk driving (or speeding or distracted driving) is not a concern. Certainly it is. But what we must address here is the parties' reasonable expectations of the scope of coverage for an "accident." Reviewing the question de novo and strictly construing the terms of the policy in the insured's favor, we hold that "accident," as used in the AD&D policy, extends coverage to an unintended death resulting from an vehicle crash where the driver had a blood alcohol content approximately 2.8 times the legal limit and where the vehicle was being driven approximately twenty miles an hour over the speed limit on a two-lane rural road at night. Said another way, to interpret the term "accident" as used in the AD&D policy at issue here to preclude coverage under these circumstances would not be faithful to the reasonable expectations of the

---

[17]By submitting the death certificate and state trooper's investigative report, the LaAsmars satisfied their burden of showing the death was an accident according to their reading of the Plan. Furthermore, this material was the only material requested by MetLife as necessary for the LaAsmars to substantiate their claim. On the other hand, MetLife put forth no evidence in the administrative record to show that the death was not the result of an accident, as MetLife would now read the Plan, interpreting accident as something not "reasonably foreseeable."

parties.[18]

> **c.** **Rejecting parties' post hoc explanations for what they intended "accident" to mean**

In reaching this conclusion, we reject the parties' proffered interpretations of the Plan. Instead of employing the common and ordinary understanding of the term "accident," MetLife, in denying the LaAsmars' claim for AD&D benefits, employed a "reasonable foreseeability" test, determining that Mark LaAsmar's BAC "rendered the infliction of serious injury or death reasonably foreseeable." (Aplt. App. at 103.) In applying this rule, MetLife cited to Wickman v. Northwestern National Insurance Co., 908 F.2d 1077 (1st Cir. 1990). But there

---

[18]In reaching this conclusion, we acknowledge that there are several federal ERISA cases from other circuits concluding that, under the circumstances presented in those cases, a crash occurring while the insured was driving drunk was not an "accident" under the terms of the plans at issue there. But, unlike the case here, in those cases the federal courts were reviewing the plan administrators' denial of benefits using the far more deferential arbitrary-and-capricious standard. See Stamp, 531 F.3d at 88-94; Lennon, 504 F.3d at 620, 624 (separate opinions of Rogers, J., and Boggs, J.); Eckelberry, 469 F.3d at 342-43; Cozzie, 140 F.3d at 1108-11. In fact, one commentator has noted that "there is a clear split between state and federal courts on" the issue of whether an insured's death while drunk driving is an accident, with "courts applying state law . . . largely" concluding "such deaths to be accidental," and "federal courts interpreting ERISA have generally found them [instead] to be non-accidental." Michael E. Gardner, Note, "Accidental Death Insurance Coverage of Drunk Drivers," 69 Mo. L. Rev. 235, 250-51 (Winter 2004). One suggested explanation for this "clear split" of authority is that the federal courts often apply the "extremely deferential" arbitrary-and-capricious standard of review to plan administrators' benefits decisions being challenged under ERISA. See id. And even when a federal court is instead reviewing an administrator's benefits denial de novo, that court is still applying "federal common law on the subject of drunk drivers, which has been created by courts applying the highly deferential arbitrary and capricious standard of review." Id. at 251.

are several reasons why we reject MetLife's effort to substitute new language for the language the parties chose in the insurance contract.

First and foremost, the parties did not expressly state in the Plan that this was their understanding of the term "accident." See id. "Reasonable foreseeability," besides itself being ambiguous, injects a different spin to the analysis and, depending upon how broadly it is interpreted, could drastically reduce coverage under the AD&D policy since, particularly in hindsight, it could be said many accidents are foreseeable, even reasonably foreseeable, as opposed to unforeseeable.

Second, Wickman itself, upon which MetLife purports to rely, did not apply a reasonable foreseeability test, but instead asked whether the injuries or loss at issue was "highly likely to occur."[19] See id. at 1088; see also Lennon, 504 F.3d at 625 (noting that a number of courts have morphed Wickman's "highly

---

[19]More specifically, Wickman applied both a subjective and an objective test, looking first to the insured's actual, subjective expectations, and then the reasonableness of those expectations. See 908 F.2d at 1087-88. Wickman acknowledged, however, that in most cases, it will be impossible to know the insured's subjective expectations. Id. at 1088. Where that was true, therefore, Wickman inquired instead whether an objective person, sharing the same background and characteristics as the insured, would have viewed the injury as "highly likely to occur as a result of the insured's intentional conduct." Id. Admittedly, in later parts of the opinion, the Wickman court used other language, including whether "Wickman expected the result," whether a "reasonable person in his shoes would have expected the result," and whether "any other expectation would have been unreasonable." Id. at 1089. Nevertheless, in its formal articulation of the test, Wickman asked whether the injury or lass was "highly likely" to occur. Id. at 1088.

likely" standard into a "reasonable foreseeability" test); id. at 628 (Clay, J.,

dissenting) (noting "many courts have incorrectly framed the objective prong of

the Wickman inquiry in terms that water it down in substance, asking whether an

injury was 'reasonably foreseeable'"); Richmond, 32 Seattle U. L. Rev. at 102.

Nor is Wickman directly analogous to the situation at issue here. Wickman did

not involve a situation where the insured was driving drunk and, as such, is only

generally relevant.[20] See generally Kovach, 587 F.3d at 334 (declining, in case

regarding an injury that the insured suffered while riding a motorcycle while

drunk, to rely on case law that "did not even involve intoxication"). Moreover,

unlike the Plan at issue here, the policy in Wickman did specifically define the

term "'accident'" as "'an unexpected, external, violent, and sudden event.'" 908

---

[20]In Wickman, the insured parked his car in a "break-down lane" of a highway, walked thirty feet onto a highway bridge, climbed over the three- to four-foot-high guard rail, stood on the edge of a steel beam a few inches wide, and while holding on with only one hand, fell forty to fifty feet to the railroad tracks below. See 908 F.2d at 1079-80. A number of courts have, nevertheless, applied Wickman to cases presenting the question of whether a drunk driving crash was an "accident" under an AD&D policy. See Poeppel v. Hartford Life Ins. Co., 273 F. Supp. 2d 714, 719-20 (D.S.C. 2003) (discussing cases), aff'd, 87 Fed. App'x 885 (4th Cir. 2004) (unpublished). Nevertheless, because of the differences in the circumstances presented here from those addressed in Wickman, we do not consider Wickman determinative in the context of the question before us, which is whether a drunk driving crash should be considered an accident under the plan at issue. See Parker v. Danaher Corp. ex rel. Danaher Corp. Employee Benefit Plan, 851 F. Supp. 1287, 1295 (W.D. Ark. 1994) (criticizing Wickman's analysis as "shed[ding] little light in an area of law already unduly complicated by reference to various artificial distinctions"; choosing instead to simply apply the "natural meaning" of "accident," asking only whether the insured expected to die).

36

F.2d at 1085. <u>Wickman</u>'s test, therefore, logically focused on "the level of expectation . . . necessary for an act to constitute an accident." <u>Id.</u>; <u>see also</u> <u>id.</u> at 1087-89.

Third, the parties here could not have intended, at the time they agreed upon the AD&D coverage at issue here, that that coverage would not include any situation where a loss was reasonably foreseeable because a person purchases AD&D coverage exactly because something is reasonably foreseeable. <u>See</u> 10 Couch on Insurance § 139:11 (noting that "[t]he fact that injuries and death are 'foreseeable' in a general manner is the very reason that people purchase insurance against accidents—no one who found a plane crash 'unforeseeable' would purchase trip insurance"; further noting that "[a]lmost all adverse events are 'foreseeable' in the abstract sense: being hit by a car while crossing the street, breaking a leg while skiing, dying from the effects of drugs (be they legal or illegal), even having a plane crash into your house"). Thus, MetLife's post hoc application of this "quite broad" reasonably foreseeable standard to determine what is and is not an accident under the Plan "frustrate[s] the legitimate expectations of plan participants, for insurance presumably is acquired to protect against injuries that are in some sense foreseeable." <u>King v. Hartford Life & Accident Ins. Co.</u>, 414 F.3d 994, 1002 (8th Cir. 2005) (en banc) (noting this possibility); <u>see</u> <u>Kovach</u>, 587 F.3d at 335 (noting the same); <u>Sanchez</u>, 2009 WL 3255160, at *6 n.18 (noting that the "foreseeability" test is "disturb[ing]" because

37

it "presents the opportunity for [the insurer] to deny coverage for risky, but legal, activities (e.g., standing on a ladder, driving an automobile, playing basketball)"); Danouvong, 659 F. Supp.2d at 328 (noting that a foreseeability standard "would exclude from coverage any death or injury resulting from known risky activity in which a driver-insured engages, such as driving while extremely tired, using a cell phone, or being drunk, because each of these activities increases, by some anticipatable amount, the chance of a car collision;" further noting that such a foreseeability standard, without any limit, thus "would provide coverage to drivers-insureds in only a diminishingly small number of car collisions"); Harrell v. Metro. Life Ins. Co., 401 F. Supp. 2d 802, 812-13 (E.D. Mich. 2005) (noting that diluting Wickman's "highly likely" standard with a "reasonably foreseeable" test "undermines common conception of 'accidental injuries,' and therefore could violate ERISA's requirement that benefit plans be 'written in a manner calculated to be understood by the average plan participant'" (quoting 29 U.S.C. § 1022(a)).

Furthermore, the phrase "reasonably foreseeable" is a term often associated with the tort concept of negligence. Yet, for the reasons stated above, "recovery on an accident insurance policy is not defeated by the mere fact that ordinary negligence of the insured contributed to the occurrence of the accident, unless the policy expressly excepts the risk of accidents due to the negligence of the insured," which the Plan at issue here does not. 10 Couch on Insurance § 139:52; see also Kovach, 587 F.3d at 335. "[H]olding otherwise would, in the majority of

38

cases, render accident policies of little value for the simple reason that the element of 'carelessness' or 'negligence' enters into most accidents." 10 Couch on Insurance § 139:52; see also Schuman, 44 Tort Trial & Ins. Prac. L.J. at 32 ("One of the chief goals of accident insurance is to protect insureds from the effects of their own acts. Even if an accident results because of the insured's own fault, the insured still expects to receive coverage. Otherwise, insurers could deny almost any claim under any accident insurance policy on the grounds that the insured contributed to the resulting accident. The insurer assumes the risk of the insured's negligence. Consequently, voluntary exposure to danger by the insured is not itself an excuse for avoiding liability.") (footnotes omitted). For this reason, too, a reasonable person in Mark LaAsmar's position could not have understood, at the time he agreed to this AD&D, that the term "accident" used in the Plan meant only those incidents where injuries or death were not reasonably foreseeable. See 10 Couch on Insurance § 139:15 (noting that "the concept of 'reasonably unforeseeable' . . . is essentially the concept employed in tort law to determine what actions are blameworthy as opposed to accidental, and is generally held inapplicable to determining whether a set of circumstances amounts to an accident for purposes of accident insurance"); see also id. §§ 139.23, 139.25; Schuman, 44 Tort Trial & Ins. Prac. L.J. at 35.

Lastly, even if we were to agree with MetLife's application of a reasonable foreseeability test, which we do not, there is nothing in the administrative record

in this case that would support MetLife's assertion that, because Mark LaAsmar's driving with a BAC of "over two times the lawful limit" made "the infliction of serious injury or death reasonably foreseeable." (Aplt. App. at 103.) See West, 171 F. Supp. 2d at 901, 903-04. The fact that driving drunk may increase the chances of being killed in an accident does not necessarily make that accident expected. Schuman, 44 Tort Trial & Ins. Prac. L.J. at 30. In fact, a number of courts have noted that, statistically, it is not reasonably foreseeable that a person driving drunk will be seriously injured or killed. See Kovach, 587 F.3d at 334-35 (citing different statistics indicating that either "one twentieth of one percent" or .17% of the people who drive drunk die in crashes); see also Richmond, 32 Seattle U. L. Rev. at 106 (suggesting "an intoxicated driver's chance of dying is about 1-in-9128," which "translates to a 99.999 percent chance of survival"). Based upon these statistics, "[w]hat 'common knowledge' should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die in or be injured in an alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed." West, 171 F. Supp.2d at 904.

The First Circuit has indicated, instead, that it is not the statistical probability of death or serious injury that is relevant here, but rather "what a reasonable person would perceive to be the likely outcome of the intentional conduct," presumably that of driving while as impaired as the insured. Stamp,

40

531 F.3d at 92. Even so, there is still nothing in the administrative record developed in this case to suggest that a reasonable person would perceive that, if he drove with a BAC of .227, early in the morning on two-lane rural roads while speeding, that he would die.[21] Cf. King, 414 F.3d at 1000, 1004 (remanding to plan administrator where administrator, in denying AD&D benefits, failed to "discuss whether evidence concerning how a reasonable person would view the likelihood of [the insured's] death was sufficient to satisfy the Wickman standard, however that might be precisely defined by the" administrator, to whom the Plan in that case had afforded discretion to interpret the Plan).

For all of these reasons, we reject MetLife's application of a reasonable foreseeability test to determine whether Mark LaAsmar's crash was an "accident" for purposes of the AD&D Plan at issue here.

The LaAsmars, on the other hand, suggest that an event will not be an "accident" under the Plan only if it was "highly likely to occur," citing Wickman.

_____

[21]Before the district court, MetLife did rely on statistics to argue that individuals in Mark LaAsmar's age group had a higher percentage of fatal, alcohol-related wrecks than members in other age groups; three times the number of alcohol-related fatal wrecks occurred at night instead of during the day; almost two-thirds of all fatal wrecks occurred on weekends nights; 85% of drivers with a BAC of .01 or higher killed in wrecks had a BAC of at least .08, and 51% had a BAC of at least .16; and in crashes involving a driver with a BAC of at least .08, 57% of drivers died. Disregarding for the moment that MetLife did not rely on these statistics to deny the LaAsmars AD&D benefits and so we cannot consider them here, see Kellogg, 549 F.3d at 829, these statistics, in any event, do not address the relevant question of how likely it is that a driver, as drunk as Mark LaAsmar was on the night of his wreck and under the circumstances presented by this case, would reach his destination safely.

But there is also no indication that the parties, at the time they entered into an agreement for AD&D coverage, intended or understood the term "accident" to mean that, either. MetLife did not draft the Plan using that language. Nor can we attribute this "highly likely" test to the plain and ordinary meaning of "accident." It is not even clear what "highly likely" means. See Kovach, 587 F.3d at 337 (suggesting "highly likely" is "a good bit more" than a 50% chance, and is perhaps a 75% chance); King, 414 F.3d at 1004 (suggesting that "highly likely" could mean "'more likely than not,' some lesser probability that exceeds 'reasonably foreseeable' but falls short of a fifty-percent chance, or something else that does not depend at all on statistical probabilities") (citations omitted). Applying a "highly likely" standard to decide what is and is not an accident still requires courts to conjure up greater and more complicated explanations for that phrase. With every such complication, the definition of "accident" gets further distanced from the plain and ordinary meaning of "accident," and thus further from what a reasonable person, in Mark LaAsmar's position, would understand to be an "accident."[22] "An insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is

---

[22]We note, however, that under a "highly likely" standard, MetLife's decision to deny AD&D benefits in this case would not fare well because there is still nothing in the record to suggest that it was actually "highly likely" that Mark LaAsmar, driving in the early morning darkness, with a .227 BAC and twenty miles above the speed limit, would die in a rollover crash, or perceive that his death under those circumstances would be "highly likely."

42

purchasing under an insurance policy." Kovach, 587 F.3d at 332-33 (quotation, alteration omitted). We, therefore, also reject that formula for determining what is and is not an "accident" under the Plan at issue here.

### d. Conclusion

Focusing only on the plain and ordinary meaning of the term "accident," then, as understood by a reasonable person in Mark LaAsmar's position at the time he agreed to MetLife's AD&D coverage, we conclude that Mark LaAsmar died in an "accident."

If MetLife wants to exclude from its AD&D coverage vehicle wrecks caused by its insured's drunk driving, it can certainly do so by drafting the language of its Plan clearly to say so. See Kovach, 587 F.3d at 336; see also Marjorie A. Shields, "Clause in Life, Accident, or Health Policy Excluding or Limiting Liability in Case of Insured's Use of Intoxicants or Narcotics," 100 A.L.R.5th 617 (2010) (collecting cases); 32 Appleman on Insurance 2d § 188.06[C][3] at 200-03 (1996) (discussing such exclusions); Richmond, 32 Seattle U. L. Rev. at 113-14 (same); Schuman, 44 Tort Trial & Ins. Prac. L.J. at 39-43, 61. "The sheer number of court cases nationwide involving disputes over claims by drunk drivers certainly would have put [MetLife] on notice that it would likely face claims under its AD&D policies based on injuries sustained in alcohol-related collisions." Kovach, 587 F.3d at 336. It is ultimately the insurer that must decide, and then clearly articulate, what its AD&D insurance will cover.

43

See Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1457 (5th Cir. 1995) (noting, after holding that insured's beneficiary was entitled to AD&D benefits, that "life insurance companies have ample ways to avoid judgments like this one"); see also 10 Couch on Insurance § 139:8 (noting that "[t]he parties to accident insurance contracts have the right and power to contract as to the accidents and risks for which the company shall and shall not be liable, subject to the restraints of public policy, and the courts may not make new or different contracts for them") (footnote omitted); id. § 139.33 (noting that "[p]rovisions of insurance policies excepting particular losses from the coverage thereof are ordinarily valid, for the parties to a contract of insurance have the right to limit or qualify the extent of the insurer's liability in any manner not inconsistent with statutory forms or provisions or contrary to public policy"). Moreover, if the insurer clearly and expressly addressed these matters in the terms of the plan, the insured would not have to guess at the coverage he has purchased.[23] See Kovach, 587 F.3d at 338

[23]Couch wonders, legitimately,

[i]f the language employed in these [accident insurance] contracts is so inherently ambiguous that no policy can be sufficiently clear to avoid the disputes [as to what is and is not a covered "accident"], would it not benefit us all—insurers, insureds, and society at large—to abandon the fight and either provide coverage for the types of injuries and deaths that produce the bulk of disputes, with premiums adjusted accordingly, or develop a standard list of clear exclusions from coverage that avoids the need to determine whether these circumstances fall within the definition of an accident? The use of specific exclusions, either from the definition of accident or without tying them to a specific concept,

(continued...)

44

(noting that if insurers included "an express exclusion in policies covering accidental injuries for driving while under the influence of alcohol, or for any other risky activity that the company wishes to exclude[,] [p]olicyholders would . . . be able to form reasonable expectations about what type of coverage they are purchasing without having to make sense of conflicting bodies of caselaw that deal with obscure issues of contractual interpretation"). Not only should "[t]he insured . . . know what he is getting in his insurance policy, so that he can decide whether he would like more coverage at a higher price or less at a lower price," Senkier, 948 F.2d at 1053, but ERISA requires a provider "to clearly delineate the scope of its obligations," Rasenack, 585 F.3d at 1318-19.

For all of the foregoing reasons, then, reviewing the Plan at issue here de novo and construing it strictly against MetLife, we conclude that a reasonable person in Mark LaAsmar's position would have understood the Plan's use of the term "accident" to include the crash in which he died.

### 3. Whether Mark LaAsmar's death fell within the exclusion of coverage for "injuring oneself on purpose"

Lastly, MetLife denied the LaAsmars AD&D benefits "based on the

---

[23](...continued)
could avoid many of these definitional and conceptual dilemmas although such an approach would concededly shift much of the proof burden in accident cases from insureds to insurers.

10 Couch on Insurance § 139:10; see also Kovach, 587 F.3d at 336 (noting that insurer "could have easily added an exclusion in the Plan for driving while intoxicated had it wished to do so").

purposefully self-inflicted injury exclusion" (Aplt. App. at 104), apparently referring to the Plan's exclusion of AD&D coverage for "[i]njuring oneself on purpose" (id. at 83). MetLife deemed this exclusion to apply here because

> [t]he mental and physical deficits caused by voluntarily consuming such a large quantity of alcohol necessary to produce a BAC of over 22%, resulted in reduced awareness, blurred vision, sleepiness, lack of motor control, loss of balance and judgment, etc.—typically thought of as being high or tipsy or drunk—were purposefully self-inflicted and caused or contributed to the death.

(Id. at 104.)

MetLife had the burden of establishing that the loss fell within this exclusion from coverage. See Rasenack, 585 F.3d at 1319. It failed to meet that burden here.

There is, as we have already noted, no evidence in the record indicating that Mark LaAsmar intended to injure himself "on purpose" on the night of the wreck. See Kovach, 587 F.3d at 338-39 (rejecting argument that wreck occurring while insured was driving drunk fell within exclusion for "purposeful self-inflicted wound"); King, 414 F.3d at 1004 (rejecting argument that insured's "alcohol intoxication was itself an 'intentionally self-inflicted injury' that 'contributed to' his injuries and death"; holding, instead, that that argument was "based on an unreasonable interpretation of the plan" because "[t]he most natural reading of the exclusion for injuries contributed to by 'intentionally self-inflicted injury, suicide, or attempted suicide' does not include injuries that were

46

unintended by the participant, but which were contributed to by alcohol intoxication"); Harrell, 401 F. Supp. 2d at 805, 808-13 (rejecting as arbitrary and capricious administrator's application of exclusion for "intentionally self-inflicted injury" to car crash occurring while insured had a BAC of .17); see also Santaella v. Metro. Life Ins. Co., 123 F.3d 456, 465 (7th Cir. 1997) (holding that, because court had determined that insured died from an accidental overdose of prescription medication, plan administrator could not "rely upon the 'intentionally inflicted self-injury' exclusion"; further noting that the record in that case would not support any determination other than that the insured simply made a "fatal mistake"). As the Eighth Circuit has noted, "[o]ne rarely thinks of a drunk driver who arrives home safely as an 'injured' party." King, 414 F.3d at 1004 (noting further that "to define drinking to the point of intoxication as an 'intentionally self-inflicted injury, suicide, or attempted suicide' is at least a "startling construction'").

MetLife has, therefore, failed to meet its burden of proving that this exclusion precludes the LaAsmars from recovering AD&D benefits. See Rasenack, 585 F.3d at 1319.

### 4. Conclusion as to the denial of AD&D benefits

For these reasons, we AFFIRM the district court's decision to overturn MetLife's denial of the LaAsmars' claim for AD&D benefits.

47

## III. ATTORNEY'S FEES AND PREJUDGMENT INTEREST

In their cross-appeal, No. 07-1286, the LaAsmars argue that the district court abused its discretion in failing to rule at all on their requests for attorney's fees and prejudgment interest.

### A.    Attorney's fees

ERISA provides, in pertinent part that, "[i]n any action under this subchapter . . . by a . . . beneficiary . . . , the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). MetLife argues, however, that the LaAsmars failed to request attorney's fees in a proper manner. That is true.

Prior to the district court's decision on the merits of their case, the LaAsmars did request attorney's fees from the district court in several of their pleadings. Nevertheless, after the district court entered judgment on their behalf, the LaAsmars failed to follow the requirements of Fed. R. Civ. P. 54(d)(2) and the relevant local rule in seeking an award of attorney's fees. See West v. Local 710, Bhd. of Teamsters Pension Plan, 528 F.3d 1082, 1087 (8th Cir. 2008) (applying Rule 54(d) to request for attorney's fees under ERISA's 29 U.S.C. § 1132(g)(1)); Bender v. Freed, 436 F.3d 747, 749-50 (7th Cir. 2006) (same); Jones v. Central Bank, 161 F.3d 311, 312-13 (5th Cir. 1998) (same). Rule 54(d)(2)(A) provides that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an

element of damages." In addition,

> [u]nless a statute or a court order provides otherwise, the motion must:

>> (i) be filed no later than 14 days after the entry of judgment;

>> (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

>> (iii) state the amount sought or provide a fair estimate of it; and

>> (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

Fed. R. Civ. P. 54(d)(2)(B).

Rule 54(d)(2)(D) also provides that, "[b]y local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings." The District of Colorado has established such a rule, providing that a Rule 54(d) motion for attorney's fees "shall include the following for each person for whom fees are claimed: 1. a detailed description of the services rendered, the amount of time spent, the hourly rate, and the total amount claimed; and 2. a summary of relevant qualifications and experience." D.C.Colo.L.Civ.R. 54.3(B). In addition, "[u]nless otherwise ordered by the court, a motion for attorney fees shall be supported by one or more affidavits." Id. 54.3(A).

Other than requesting attorney's fees in their pre-judgment pleadings, the

LaAsmars failed to follow any of these other required procedures. Under these circumstances, the district court did not err in not addressing their request for fees. See Bender, 436 F.3d at 750 (affirming the district court's denial of an untimely Rule 54(d)(2)(B) motion for fees in an ERISA case); cf. Quigley v. Rosenthal, 427 F.3d 1232, 1236-38 (10th Cir. 2005) (holding the district court did not abuse its discretion in denying attorney's fees because plaintiffs' Rule 54(d)(2) motion was untimely and they had failed to show excusable neglect that would justify extending the time they had to file such a motion).

B.    **Prejudgment interest**

An award of prejudgment interest in an ERISA case is also within the district court's discretion. See Kellogg, 549 F.3d at 833; Weber, 541 F.3d at 1016. MetLife again argues that the LaAsmars waived their request for prejudgment interest by failing to pursue it in the district court. The LaAsmars did request prejudgment interest in the concluding paragraph of a response they filed to one of MetLife's motions, which was probably sufficient to raise the request, initially, before the district court. See Mascenti v. Becker, 237 F.3d 1223, 1245 (10th Cir. 2001) (citing McNickle v. Bankers Life & Cas. Co., 888 F.2d 678, 681 (10th Cir. 1989) (per curiam)).

After the district court entered final judgment in their favor, the LaAsmars filed a Motion for Extension of Time to File Motion to Alter or Amend Judgment. In that motion, the LaAsmars noted that the district court had never ruled on their

50

request for prejudgment interest, but that the parties might be able to resolve the issue among themselves, making a motion to alter or amend unnecessary. Therefore, the LaAsmars requested that the district court grant them a two-week extension, until June 26, 2007, to file a motion to alter or amend. The district court did not rule on that extension-of-time request, and the LaAsmars never filed a motion to alter or amend. The parties, instead, filed the notices of appeal underlying the cross-appeals at issue here. Eventually, the district court, on October 1, 2007, denied the LaAsmars' motion for an extension of time to file a motion to alter or amend as moot because they never filed such a motion within the requested two-week extension period.

In light of this series of post-judgment events, the LaAsmars have waived any request for prejudgment interest. The LaAsmars' motion for an extension of time indicated to the district court that there was no need at that time for it to act on the LaAsmars' request for prejudgment interest. And the LaAsmars never raised the issue again to the court.

## C.    Conclusion

Because the LaAsmars failed to request an award of attorney's fees in a proper manner, the district court did not err in not addressing that request. Nor did the district court err in not addressing prejudgment interest.

## IV. CONCLUSION

For these reasons, we AFFIRM the district court's decision overturning

51

MetLife's denial of the LaAsmars' claim for AD&D benefits.  We decline to grant

relief to the LaAsmars on their cross-appeal, and so DISMISS that cross-appeal.

Nos. 07-1267 & 07-1286, <u>LaAsmar v. Phelps Dodge Corp.</u>

**BRISCOE,** Chief Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. Although I agree with much of the majority opinion, I disagree with Part II.B thereof, in which the majority discusses whether MetLife erred in denying the LaAsmars' claim for accidental death benefits. As I shall outline in greater detail below, Mark LaAsmar's death was not the result of an "accident," and I would thus reverse the decision of the district court and remand with directions to enter summary judgment in favor of defendants.

According to the Summary Plan Description (SPD), the triggering event for payment of "Accidental Injury Benefits" was the occurrence of an "accident." App. at 82. The SPD did not, however, define the terms "accident" or "accidental."

Because the Plan in this case "was established under ERISA, federal common law rules of contract interpretation" must be applied in determining the meaning of any undefined Plan term. <u>Santaella v. Metro. Life Ins. Co.</u>, 123 F.3d 456, 461 (7th Cir. 1997); <u>see</u> <u>Miller v. Monumental Life Ins. Co.</u>, 502 F.3d 1245, 1249 (10th Cir. 2007). "[A]pplying federal common law, . . . the proper inquiry is not what [the Plan administrator] intended a term to signify; rather, we consider the 'common and ordinary meaning as a reasonable person in the position of the [plan] participant . . . would have understood the words to mean.'" <u>Miller</u>, 502

F.3d at 1249 (quoting Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard, 393 F.3d 1119, 1123 (10th Cir. 2004) (internal quotation marks omitted)). Any ambiguities "must be construed against [the plan administrator] in accordance with the doctrine of *contra proferentem*." Id. at 1253 (italics in original).

The term "accident" is commonly and generally defined as "[a]nything that happens without foresight or expectation; an unusual event, which proceeds from some unknown cause, or is an unusual effect of a known cause; . . . the unforeseen course of events." Oxford English Dictionary (2d ed. 1989). Thus, as suggested by defendants, it is clear that the term, by common definition, necessarily indicates a lack of foreseeability on the part of the person involved in the accident. See Santaella, 123 F.3d at 462 ("[W]e treat the term 'accidental' as it is commonly defined, as 'unexpected or unintentional'"). Indeed, in determining "whether a certain result is accidental" in the context of a dispute involving insurance coverage, "'it is customary to look at the casualty [or injury] from the point of view of the insured.'" Id. (quoting Appleman, Insurance Law and Practice § 360, at 452-53 (1981)).

Having determined that we must examine the injury from the point of view of the insured, the next question is how, precisely, to formulate the foreseeability test. A review of similar ERISA cases reveals three possible approaches. The first, and most narrow, approach to foreseeability asks simply whether the insured

subjectively expected to die or be injured.  See Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1455-56, n.8 (5th Cir. 1995) (discussing, but not adopting, approach utilized by court in Parker v. Danaher Corp., 851 F. Supp. 1287 (W.D. Ark. 1994)).  If it is determined that the insured subjectively expected not to die or be injured, then the injury or death is deemed "accidental."  See id.  The second and third approaches also begin by examining whether the insured subjectively expected not to die or be injured, but add an additional step, i.e., assessing whether the insured's subjective expectation was objectively reasonable (or, if the insured's subjective expectation cannot be determined, how a reasonable person in the shoes of the insured would have viewed the likelihood of injury or death). See id. at 1456 (adopting second approach); Sigler v. Mut. Benefit Life Ins. Co., 663 F.2d 49, 49 (8th Cir. 1981) (non-ERISA case adopting third approach).  In conducting this additional step, both the second and third approaches analyze objective reasonableness from the perspective of "a reasonable person" "with background and characteristics similar to the insured."  Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1126 (9th Cir. 2002).  The second and third approaches differ, however, in precisely how likely an injury or death must be to render it foreseeable, and thus not accidental.  Under the second approach, an expectation of survival (or non-injury) is objectively reasonable if death (or injury) was not "substantially certain" or "highly likely" to occur as a result of the insured's intentional conduct.  Todd, 47 F.3d at 1456 (utilizing "substantially certain" test);

3

Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1088 (1st Cir. 1990) (utilizing

"highly likely to occur" test).  Under the third approach, death or injury is not

considered accidental if a reasonable person in the insured's position would have

recognized that his conduct could result in death or injury.  Sigler, 663 F.2d at 49.

In my view, there are a host of reasons favoring adoption of the second, or

middle, approach.  To begin with, the first approach, though certainly the most

favorable to the insured, has not been argued by the LaAsmars in this case, and

has, as far as I can determine, only been adopted by a single federal district court.

Further, the first approach appears problematic because it is often difficult or

impossible to determine the subjective expectations of the insured, and even if the

insured's subjective intent can be determined, the first approach could lead to

wildly varying results in cases involving similar policies and circumstances.  As

for the third approach, not only has it failed to become widely adopted, it is most

favorable to the defendants (who have not even argued in favor of the approach),

and thus is contrary to the doctrine of *contra proferentem*.  That leaves the

second approach, which has been widely adopted in cases involving insurance

contracts governed by ERISA, and could fairly be said to be the most rational and

reasonable of the three approaches.  See Padfield, 290 F.3d at 1127 (concluding

"that the 'substantially certain' test [wa]s the most appropriate one, for it best

allows the objective inquiry to 'serve [ ] as a good proxy for actual

expectation.'") (quoting Wickman, 908 F.2d at 1088).

4

That leaves the ultimate question of whether, applying the second approach to the circumstances presented in this case, Mark LaAsmar's death was "accidental." "[A]s is usually the case" in circumstances where the insured has died, the record "evidence is not sufficient to ascertain with certainty the subjective expectation" of Mark LaAsmar, i.e., whether he expected to be injured or killed by driving while so heavily intoxicated and without wearing a seatbelt. Santaella, 123 F.3d at 462. Thus, we must "ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed [injury or death] as highly likely," Wickman, 908 F.2d at 1088, or "substantially certain," Todd, 47 F.3d at 1456, to occur as a result of Mark LaAsmar's conduct.

The autopsy performed on Mark LaAsmar indicated that his blood alcohol content (BAC) at the time of his death was 0.227g/100ml, an amount nearly three times greater than Colorado's legal blood alcohol limit of 0.08g/100ml. Other federal courts have, in similar circumstances, referred to readily available public information, including various on-line resources, regarding the effects of such a BAC level. E.g., Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 90 (1st Cir. 2008) (citing Nat'l Hwy. Traffic Safety Admin., U.S. Dep't of Transp., Setting Limits, Saving Lives: The Case for .08 BAC Laws, DOT HS 809 241, revised Apr. 2001). Consulting such resources in this case, there appears to be no question that a BAC level of 0.227g/100ml would have resulted in severe impairment of Mark LaAsmar's ability to drive and, correspondingly, would have substantially

5

increased the likelihood of him crashing his vehicle while driving.[1]  For example, according to a review of research literature available on the National Highway Traffic Safety Administration's (NHTSA's) web site, there is "strong evidence that impairment of some driving-related skills begins with any departure from zero BAC," and that "[v]irtually all subjects tested in the studies reviewed . . . exhibited impairment on some critical driving measure by the time they reached 0.080g/dl."  Nat'l Hwy. Traffic Safety Admin., U.S. Dep't of Transp., A Review of the Literature on the Effects of Low Doses of Alcohol on Driving-Related Skills, Section 4.1, Apr. 2000 (available at

http://www.nhtsa.dot.gov/people/injury/research/pub/Hs809028/Title.htm).

Relatedly, another publicly-available NHTSA publication states that a BAC of .10% results in "[r]educed ability to maintain lane position and brake appropriately," and that a BAC of .15% results in "[s]ubstantial impairment in vehicle control, attention to driving task, and in necessary visual and auditory information processing."  Nat'l Hwy. Traffic Safety Admin., U.S. Dep't of Transp., The ABCs of BAC, Feb. 2005 (available at

http://www.stopimpaireddriving.org/ABCsBACWeb/index.htm).  In turn, "[t]he risk of a fatal crash increases rapidly as the blood alcohol concentration of a

---

[1] Although the majority opinion likewise refers to some publicly available information regarding the effects of alcohol intoxication, that cited information only appears to focus on the effects of intoxication at a level equivalent to the legal BAC limit in most states, and thus tells us nothing about the effects of the specific BAC level that Mark LaAsmar had at the time of his death.

6

driver increases." Robert D. Brewer et al., <u>The Risk of Dying in Alcohol-Related Automobile Crashes among Habitual Drunk Drivers</u>, 331 The New Eng. J. Med., 513-517 (August 25, 1994). "A driver with a blood alcohol concentration of 100 mg per deciliter (22mmol per liter) or higher is 7 times more likely to be involved in a fatal motor vehicle crash than a driver who has not consumed alcoholic beverages, and a driver with a blood alcohol concentration of 150 mg per deciliter (33 mmol per liter) or more is about 25 times more likely." <u>Id.</u> "For drivers with [B]AC's above 0.15% on weekend nights, the likelihood of being killed in a single-vehicle crash is more than 380 times higher than it is for non-drinking drivers." Wis. Dep't of Transp., Safety & Consumer Protection, Drunk Driving Risk Factors, available at

http://www.dot.wisconsin.gov/safety/motorist/drunkdriving/factors.htm.

In light of such widely available and generally well-publicized data, it is clear that an objectively reasonable person in Mark LaAsmar's position would have viewed driving with a BAC of 0.22%, late at night on a two-lane county road, at sixty miles per hour in a forty mile-per-hour zone, and without a seat belt, as highly or substantially likely to result in serious injury or death.[2] Thus, it is likewise clear that Mark LaAsmar's death cannot be classified as "accidental"

---

[2] I am not persuaded, as suggested by the majority, that "MetLife was applying . . . a per se rule based solely upon the degree of intoxication involved." Maj. Op. at 20. In any event, given our de novo standard of review, it is unnecessary to decide whether MetLife intended such a per se rule.

7

for purposes of the Plan at issue. As the Fourth Circuit has noted, "[b]y choosing to drive under circumstances where his vision, motor control, and judgment were likely to be impaired," Mark LaAsmar "placed himself and fellow motorists in harm's way," and "[t]o characterize harm flowing from such behavior as merely 'accidental' diminishes the personal responsibility that state laws and the rules of the road require." Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 346 (4th Cir. 2006).

Notably, federal courts performing this same type of analysis "have found with near universal accord that alcohol-related injuries and deaths are not 'accidental' under insurance contracts governed by ERISA." Id. at 344 (citing cases). In doing so, "[t]hese courts have . . . reasoned that since the hazards of drinking and driving are widely known and widely publicized the insured should have known that driving while intoxicated was highly likely to result in death or bodily harm." Id. at 345 (internal quotation marks omitted).

In reaching a different conclusion, the majority opinion states that "[m]ost people . . . would define accident to include many circumstances where a driver undertakes conduct that makes a crash more likely, such as driving when sleepy or when the weather is bad, talking on the cell phone, reaching for a compact disc, or turning to speak to a child while operating a vehicle." Maj. Op. 30. In turn, the majority opinion suggests that some "of these volitional acts increase[] the probability of a wreck . . . to an even greater degree than driving drunk." Id.

8

Finally, the majority opinion asserts that "[s]omewhere in the middle of this spectrum of circumstances falls Mark LaAsmar's decision to drive home in the early morning darkness on two-lane country roads, with a BAC of .227 and going sixty miles an hour in a forty-mile-per-hour zone." Id. at 31. I strongly disagree with this analysis.

To begin with, the examples of driving-related conduct cited by the majority opinion are quite vague, and it is the precise circumstances of each case that, in the end, determine the foreseeability of the risk undertaken by a driver by engaging in a particular type of conduct. While I do not disagree that at least some of the general categories of causal conduct cited by the majority could reasonably be deemed "accidental," I submit that each of those categories involve far less of a risk of negative consequences than did the reckless conduct engaged in by Mark LaAsmar immediately prior to the crash that took his life.

Relatedly, I also reject the majority opinion's suggestion that driving while talking or texting on a cell phone "increases the probability of a wreck . . . to an even greater degree than" the conduct of Mark LaAsmar in this case. Id. at 30. A careful examination of the two authorities cited by the majority opinion firmly establishes that neither support such a proposition. For example, while the law review article cited by the majority opinion states that "'the performance of drivers who are conversing on cell phones is *more impaired* than drivers who are intoxicated.,'" Douglas R. Richmond, "Drunk in the Serbonian Bog: Intoxicated

9

Drivers' Deaths as Insurance Accidents," 32 Seattle U. L. Rev. 83, 86 (Fall 2008) (emphasis in original; quoting Ira H. Lessfield & Richard L. Segal, Driving While on the Cell Phone, BRIEF, Summer 2007, at 58, 59), an examination of the underlying research study that gave rise to this statement involved drivers who were given "a mixture of orange juice and vodka . . . calculated to achieve a blood alcohol concentration of 0.08 wt/vol," David L. Strayer & Frank A. Drews, Multitasking in the Automobile, www.psych.utah.edu/lab/appliedcognition/publications/multitasking.pdf. In other words, the quoted statement from the law review article was based on a comparison of driving while conversing on a cell phone versus driving with a BAC at the legal limit in most states, including Colorado. Quite obviously, this study says nothing about the relative risks of driving while conversing on a cell phone versus the conduct engaged in by Mark LaAsmar, i.e., driving with a BAC nearly three times the legal limit (and at night, on a two-lane county road, at excessive speed, and without wearing a seat belt). Similarly, the study cited by the Sixth Circuit in Kovach v. Zurich American Insurance Company, 587 F.3d 323 (6th Cir. 2009), refers to "a study of young drivers in England f[inding] that reaction times of young drivers were reduced by text messaging three times more than by drinking alcohol to the legal limit." Id. at 335 (italics omitted; emphasis added). Because this study involved participants with substantially lower BACs than Mark LaAsmar, it tells us nothing about the relative risks of driving while

10

text messaging versus driving under the precise conditions that immediately preceded Mark LaAsmar's fatal wreck.

Finally, I reject the majority opinion's assertion that "[s]omewhere in the middle of th[e] spectrum of circumstances [it has described] falls Mark LaAsmar's decision to drive home in the early morning darkness on two-lane country roads, with a BAC of .227 and going sixty miles an hour in a forty-mile-per-hour zone." Maj. Op. at 31. In my view, Mark LaAsmar's conduct falls at the far end of the spectrum described by the majority. More specifically, whereas most, if not all, of the examples of conduct listed by the majority could be classified as negligent, I believe that Mark LaAsmar's conduct was reckless or grossly negligent, e.g., Farmer v. Brennan, 511 U.S. 825, 836 (1994) ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."), and indeed can be fairly compared to the majority opinion's earlier example of an "insured [who] died as a result of playing Russian roulette," Maj. Op. at 35.

In sum, I believe the majority opinion is wrong in affirming the district court's conclusion that Mark LaAsmar's death was "accidental" within the meaning of the Plan, and in turn affirming the grant of summary judgment in favor of the LaAsmars. I would reverse the judgment of the district court and remand with directions to enter summary judgment in favor of defendants.

11