**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 13, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

M.K.,

>    Plaintiff - Appellant,

v.

VISA CIGNA NETWORK POS PLAN,

>    Defendant - Appellee.

No. 14-4143

(D.C. No. 1:13-CV-00073-DAK)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, HOLMES** and **MORITZ**, Circuit Judges.

Plaintiff M.K., a minor who underwent residential treatment for an eating disorder, filed this action claiming that the administrator of her health care plan, defendant Visa Cigna Network POS Plan,[1] wrongly denied her request for coverage for the residential treatment. Specifically, M.K. alleged that, contrary to the conclusion reached by defendant, residential treatment for her eating disorder was "medically necessary" under the terms of her health care plan. M.K. further alleged that defendant's decision was

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] We shall assume that this name, which is listed in the parties' pleadings but does not appear in the administrative record, is intended to refer both to the Visa Welfare Benefits and Cafeteria Plan and the CIGNA Network POS Medical Plan.

procedurally flawed and was therefore not entitled to any deference by the district court.

The district court, after reviewing the administrative record and hearing oral arguments from the parties, rejected plaintiff's arguments, determined that the denial of coverage was not arbitrary and capricious, and awarded judgment in favor of the defendant. M.K. now appeals from the district court's ruling. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

### *Factual background*

At the time of the relevant events in this case, M.K.'s father was employed by Visa Inc. (Visa) as a truck driver. Visa had established the Visa Welfare Benefits and Cafeteria Plan (the Visa Plan) to provide employee welfare benefits for its "Covered Employees." SA at 1025, 1028.[2] M.K.'s father had elected to participate in the Visa Plan and was considered a "Covered Employee." Id. at 1029 (defining "Covered Employee"). M.K. qualified as an "Eligible Dependent" under the Visa Plan because she was an "unmarried dependent child who [wa]s under age 19 . . . [and] supported by [her father] and not working full-time." Id. at 117, 1028-29 (defining "Covered Dependent" and "Dependent").

The Visa Plan encompassed several component plans that provided different types of benefits. Of relevance here, the Visa Plan provided mental health coverage through the CIGNA Network POS Medical Plan (POS Plan). SA at 123; see also SA at 128 (referring

---

[2] The Sealed Appendix will be cited as "SA."

to POS Plan as "CIGNA Network Point of Service . . . Plan"). The POS Plan was a "self-insured plan," meaning that "[b]enefits from the [P]lan [we]re paid from employee contributions, as applicable, and from the general assets of Visa, as needed." Id. at 188. Benefits under the POS Plan were outlined in and defined by the Visa Plan's official plan document (Visa Plan Document) and by the POS Plan's Summary Plan Description (POS SPD).

The Visa Plan Document defined the term "Plan Administrator" in the following manner:

> "Plan Administrator" shall mean the Visa Global Head of Human Resources. If the Plan Administrator appoints a claims administrator to perform any function hereunder, any reference to the term "Plan Administrator" shall be deemed a reference to such claims administrator, but only with respect to such function.

Id. at 1032 (underlining in original). The Plan Administrator was afforded "full power, discretion, and authority to administer the [Visa] Plan and to construe and apply all of its provisions." Id. at 1053. As specified in the POS SPD, Connecticut General Life Insurance Company (Connecticut General) was appointed to serve as the claim administrator for the POS Plan. As a result, Connecticut General possessed the power, discretion, and authority to construe and apply all of the provisions of the POS SPD.

The POS Plan provided coverage for "[m]edically necessary mental health/chemical dependency benefits . . . through a separate network of professionals managed by CIGNA Behavioral Health (CIGNA)." Id. at 49. CIGNA was "a licensed utilization review agent" that "review[ed] certain health care services for medical

3

necessity for Connecticut General." Id. at 272.

The POS Plan included coverage for "[r]esidential treatment for mental health and chemical dependency." Id. at 51. For coverage under the POS Plan to apply to such residential treatment, "[p]re-authorization [wa]s required." Id. If pre-authorization was received, the POS Plan paid 100% of expenses if a POS Plan provider was used; otherwise, the POS Plan paid 70% of expenses, after a deductible was met, if a non-POS Plan provider was used. Id.

Both the Visa Plan Document and the POS SPD defined the term "medically necessary" as follows:

> Medically necessary covered services and supplies are those determined by the Medical Director to be:
>
> • required to diagnose or treat an illness, injury, disease or its symptoms;
>
> • in accordance with generally accepted standards of medical practice;
>
> • clinically appropriate in terms of type, frequency, extent, site and duration;
>
> • not primarily for the convenience of the patient, physician or other health care provider; and
>
> • rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting.

Id. at 68, 195.

It is undisputed that M.K. suffered from an eating disorder and, as a result, engaged in periods of binge eating followed by periods of purging. M.K. also

4

experienced frequent anxiety and exhibited behavioral issues, including running away from home on several occasions. On June 6, 2011, M.K.'s father called the POS Plan administrator's customer service line to ask if Avalon Hills, an inpatient treatment facility, was a POS Plan provider. M.K.'s father informed the customer service representative of the issues that M.K. was dealing with and expressed his opinion that inpatient treatment was needed to address those issues. During his conversation with the customer service representative, M.K.'s father indicated that M.K.'s weight was normal, that she was not medically compromised by her eating disorder, and he denied that she was suicidal. The customer service representative informed M.K.'s father that Avalon Hills was not a POS Plan provider. The customer service representative informed M.K.'s father of an available POS Plan provider called the Center for Change that provided inpatient services. The customer service representative also offered to refer M.K. to POS Plan providers that could offer M.K. outpatient services. M.K.'s father declined any such referrals, stated that his plan was to continue to pursue treatment for M.K. at Avalon Hills, and to see if Avalon Hills would offer a discount. The customer service representative concluded the call by explaining the requirements for coverage under the POS Plan, including medical necessity and the precertification process.

On June 7, 2011, M.K. was admitted to Avalon Hills for the residential treatment of her eating disorder. "Upon admission, she was diagnosed with bulimia nervosa purging type, general anxiety disorder, mood disorder, moderate malnutrition, hypothyroidism, postural dizziness, back pain, problems with her primary support and

5

social issues." App. at 8.

On June 8, 2011, a representative of Avalon Hills contacted CIGNA, informed them of M.K.'s admission to Avalon Hills, and requested authorization for mental health residential treatment. A specialist employed by CIGNA proceeded to review the information received from Avalon Hills about M.K. and prepare a summary for the file. The CIGNA specialist then referred the file for a physician peer review.

That same day, June 8, 2011, Dr. Narendra Patel, a board-certified psychiatrist employed by CIGNA, reviewed the file and spoke by telephone with Dr. Sarah Boghosian, M.K.'s physician at Avalon Hills. After doing so, Dr. Patel concluded that the inpatient residential treatment of M.K.'s eating disorder was not medically necessary:

> Based upon the available information, [M.K.'s] symptoms do not meet the medical necessity criteria of CIGNA Behavioral Health's Level of Care Guidelines for Child/Adolescent Psychiatric Residential . . . for admission and continued stay from 6/7/11 as [she is] not in need of 24 hour supervision. [She is] medically stable. [Her] blood pressure and pulse are with-in-normal range. [She is] not voicing any thoughts and intents of harm to self or others. [She is] able to care for [her] needs. [She] ha[s] supportive family. Although [she] ha[s] urges to purge, Partial Hospitalization Program is available to provide the structure. Lower level of care such as Partial Hosptialization [sic] is available to assist [her] learn coping skills to deal with binging, purging and restricting.

SA at 961.

On June 9, 2011, CIGNA sent a letter to M.K.'s father explaining "that the requested services [we]re not covered" under the POS Plan. Id. at 272. The letter repeated, almost word-for-word, the above-quoted conclusion from Dr. Patel. The letter in turn advised M.K.'s father that "[i]f [he] cho[se] to proceed with the requested

6

service(s), any claims associated with the denied request w[ould] not be considered for payment." Id. at 273. The letter further advised that "[i]f [M.K.'s father was] not satisfied with th[e] coverage decision, [he], [his] authorized representative, or [M.K.'s] behavioral health care professional" could "start the appeal process by submitting a request along with any additional supporting information within 365 days of the date of th[e] letter to" CIGNA. Id. In addition, the letter advised that M.K.'s father would "have the right to bring legal action under section 502(a) of ERISA following an adverse benefit determination." Id. at 274.

Despite CIGNA's denial of coverage, M.K.'s father chose to leave M.K. in residential treatment at Avalon Hills. M.K. remained there continuously until December 9, 2011, when she was discharged. The total bill for M.K.'s treatment at Avalon Hills was in excess of $200,000.

On November 22, 2011, M.K., represented by counsel, appealed CIGNA's denial of benefits for her residential treatment at Avalon Hills. On December 20, 2011, CIGNA issued a written denial of M.K.'s appeal. CIGNA's letter noted that its "Peer Reviewer, Mohsin Qayyum, MD . . ., a board certified psychiatrist, ha[d] determined that the requested services [we]re not covered." Id. at 294. CIGNA's letter offered the following explanation for Dr. Qayyum's decision:

> Based upon the available clinical information, [M.K.'s] symptoms did not meet CIGNA Level of Care Guidelines for admission and continued stay at Residential Treatment for Eating Disorders level of care from 06/07/2011 to Discharge; [she] w[as] not in need of a highly structured environment and supervision to maintain and/or gain weight, [she] w[as] not engaging in

7

purging behaviors of such severity that [she] w[as] at risk for medical complications, and [she] w[as] not experiencing severe impairments in [her] activities of daily living due to symptoms of [her] eating disorder. [She] also ha[d] a safe family or home environment, and [she] had not had any recent, active treatment that included all appropriate modalities, without sufficient improvement, at less restrictive levels of care. Appropriate and timely treatment was available at a less restrictive level of care.

Id.

*Procedural background*

M.K. initiated this action on September 6, 2012, by filing a complaint in the United States District Court for the Northern District of California against the Visa Plan. The complaint was "brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) of the Employee Retirement Income Security Act of 1974," App. at 3, and alleged that the Visa Plan "wrongfully denied" M.K.'s "claims for medical services," id. at 10.

On January 14, 2013, the Visa Plan moved to transfer the case to the District of Utah, arguing that M.K. was a Utah resident, her father was employed in Utah, and M.K.'s medical treatment occurred in Utah. That motion was granted on May 16, 2013.

The Visa Plan filed the administrative record with the district court and the parties subsequently filed merits briefs. On October 14, 2014, after hearing oral arguments from the parties, the district court issued a memorandum decision and order concluding that the Visa Plan's decision to deny benefits was reasonable and supported by substantial evidence in the record.

Judgment was entered in the case on October 28, 2014. M.K. filed a notice of

appeal on November 14, 2014.

II

M.K. asserts two issues on appeal. First, she argues that the district court applied the wrong standard of review in assessing CIGNA's decision. Second, she argues that, regardless of the applicable standard of review, the administrative record establishes that she "was entitled to Plan benefits for her treatment at Avalon Hills." Aplt. Br. at 18. We address these issues in turn.

*Applicable standard of review*

M.K. contends that the district court erred in applying a deferential standard of review to CIGNA's decision and should instead have applied a de novo standard of review. "We review *de novo* the district court's determination of the proper standard to apply in its review of an ERISA plan administrator's decision." Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1315 (10th Cir. 2009) (internal quotation marks omitted).

"[A] denial of benefits covered by ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (brackets in original) (internal quotation marks omitted). If "the plan gives the administrator discretionary authority, . . . we employ a deferential standard of review, asking only whether the denial of benefits

9

was arbitrary and capricious." Id. (internal quotation marks omitted); see Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-11 (1989) (noting that "ERISA abounds with the language and terminology of trust law" and "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers"). "Under this arbitrary-and-capricious standard, our review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." LaAsmar, 605 F.3d at 796 (internal quotation marks omitted). It is the administrator's "burden to establish that this court should review its benefits decision at issue . . . under an arbitrary-and-capricious standard." Id.

In this case, as previously noted, the Visa Plan Document gave the plan administrator and any appointed claims administrators, including CIGNA, "full power, discretion, and authority to administer the [Visa] Plan and to construe and apply all of its provisions." SA at 1053. In turn, both the Visa Plan Document and the POS SPD, in their respective "Definitions" sections, afforded the "Medical Director" the authority and discretion to determine whether services and supplies were "medically necessary." Id. at 68, 195. Neither the Visa Plan Document nor the POS SPD expressly defined the term "Medical Director."

In light of these provisions, we have little trouble concluding that CIGNA's benefits decision is subject to the arbitrary and capricious standard of review. More specifically, these provisions make clear that CIGNA was granted the authority and discretion to review and interpret POS SPD provisions, and that, in turn, its Medical

10

Director was granted the authority and discretion to determine the services and supplies that were "medically necessary" for a particular claimant.

Indeed, M.K. concedes that the Plan "confer[red] discretionary authority on C[IGNA] to determine benefit eligibility." Aplt. Br. at 18. But she argues that there was a procedural irregularity that should have caused the district court to apply a de novo standard of review. In support, M.K. notes that the Plan required "decisions regarding medical necessity [to] be made by 'the Medical Director.'" Aplt. Br. at 18. The problem, M.K. argues, is that the Visa Plan "offered no evidence below that any of the persons involved in reviewing [her] claim for benefits was a Medical Director." Id. More specifically, M.K. points out that "[t]he denial letter was written by an 'Appeals Coordinator,' and the appeal denial letter was written by a 'Business Project Analyst,'" neither of whom were "designated as a Medical Director." Id. at 21 (internal citations omitted). In addition, M.K. asserts, "[t]he two physicians who reviewed [her] file were . . . both titled 'Peer Reviewers,'" and "[t]here is no indication that either is a 'Medical Director' for [CIGNA]." Id. Thus, M.K. argues, "[b]ecause [CIGNA] did not follow Plan procedures, its decision is not entitled to deference." Id. at 18.

It is true that procedural irregularities in a specific case can "require us to apply the same de novo review that would be required if discretion was not vested in" the plan administrator. LaAsmar, 605 F.3d at 796. More specifically, we have indicated that "de novo review may be appropriate if the benefit-determination process did not substantially

11

comply with ERISA regulations."[3] Hancock v. Metro. Life Ins. Co., 590 F.3d 1141, 1152 (10th Cir. 2009). As a result, we have applied de novo review in situations where an administrative appeal was "deemed denied" because the plan administrator "made no decision to which a court may defer," Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan, 379 F.3d 1168, 1173 (10th Cir. 2004), and where the plan administrator failed in a timely manner to resolve a claim or appeal, e.g., Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1317 (10th Cir. 2009) (plan administrator unduly delayed both in initially deciding the claim and in resolving the subsequent appeal); LaAsmar, 605 F.3d at 797 (plan administrator resolved administrative appeal approximately 170 days after receipt of appeal).

The procedural irregularity identified by M.K. in this case does not fall within these parameters. In particular, the purported procedural irregularity is not based on CIGNA's failure to substantially comply with ERISA regulations, but rather on CIGNA's failure to officially designate or identify one or more of its employees as "Medical Directors" for purposes of plan administration. Despite this failure on CIGNA's part, however, it is clear from the administrative record that CIGNA actually and promptly rendered reasoned decisions on M.K.'s initial request for coverage and on her subsequent appeal. More specifically, it is undisputed that two CIGNA employees, both board-

---

[3] The Eighth Circuit has held that, to trigger de novo review, the procedural irregularity at issue "must leave the court with serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Johnson v. United of Omaha Life Ins. Co., 775 F.3d 983, 988 (8th Cir. 2014) (internal quotation marks omitted).

12

certified psychiatrists, reviewed M.K.'s file and agreed that residential treatment for her

eating disorder and related conditions was not "medically necessary" and thus not

covered under the terms of the POS Plan. The fact that neither of these physicians were

officially titled "Medical Director" is irrelevant because there is no question that CIGNA

intended to, and in fact did, rely on these decisions as its own. Thus, in sum, the

purported procedural irregularity identified by M.K. is nothing more than a technicality,

and it is otherwise undisputed that CIGNA has substantially complied with ERISA

regulations and with the terms of the POS Plan Document and the POS SPD. As a result,

we conclude the district court did not err in reviewing CIGNA's decisions under an

arbitrary and capricious standard of review, and we are likewise bound to apply this same

deferential standard.

*Was inpatient treatment "medically necessary" for M.K.?*

In her second issue on appeal, M.K. argues that "[u]nder any standard of review,

the district court's ruling . . . should be reversed because the record clearly shows that

[she] was entitled to the benefits she sought." Aplt. Br. at 25. More specifically, M.K.

contends that the evidence in the administrative record establishes that her inpatient

treatment at Avalon Hills was "medically necessary" under the terms of the POS SPD.

Both the Visa Plan Document and the POS SPD defined the term "medically

necessary" as follows:

> Medically necessary covered services and supplies are those determined by
> the Medical Director to be:

13

• required to diagnose or treat an illness, injury, disease or its symptoms;

• in accordance with generally accepted standards of medical practice;

• clinically appropriate in terms of type, frequency, extent, site and duration;

• not primarily for the convenience of the patient, physician or other health care provider; and

• rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting.

SA at 68, 195.

M.K. argues that her residential treatment at Avalon Hills satisfied all of these requirements and was thus "medically necessary." In support, M.K. contends that the evidence in the administrative record indicates that she met "nine of the ten criteria [outlined] in," Aplt. Br. at 28, an American Psychiatric Association publication entitled "Level of Care Guidelines for Patients With Eating Disorders" (APA Level of Care Guidelines), SA at 878. "Specifically," she argues, she "(1) was medically stable; (2) had suicidal ideation; (3) had poor motivation to recover and was preoccupied with intrusive repetitive thoughts; (4) had co-morbid conditions; (5) needed supervision at all meals; (6) needed external structure to prevent over-exercising; (7) had sufficient skills to inhibit purging with support; (8) experienced family conflict at home; and (9) had no locally available treatment program." Aplt. Br. at 28-29. M.K. also argues that "Dr. [Kyle] Hancock, an independent psychologist who interviewed and tested [her] extensively after

14

admission [to Avalon Hills], and prepared a thorough 23-page report, agreed" that residential treatment was appropriate "'until her symptoms c[ould] be further stabilized.'" Id. at 30 (quoting SA at 874).

The parties dispute the relevance of the APA Level of Care Guidelines to the determination of whether M.K.'s residential treatment was "medically necessary" under the terms of the POS SPD. In particular, M.K. argues that the Guidelines demonstrate generally accepted standards of medical practice and thus must be considered under the terms of the POS SPD, while defendant argues that the Guidelines are in no way binding upon it under the POS SPD. We need not resolve this dispute because, as we shall discuss below, the Guidelines, to the extent they are relevant, do not establish that the defendant's decision was arbitrary or capricious.

*A) The APA Level of Care Guidelines*

Contrary to M.K.'s assertions, not all of the factors listed in the APA Level of Care Guidelines point toward inpatient treatment being medically necessary in her case. Indeed, as discussed in greater detail below, many of these factors weighed against residential treatment and in favor of outpatient treatment. Moreover, it is apparent that M.K.'s arguments regarding these factors fail to take into account the "arbitrary and capricious" standard of review and instead appear to be predicated on the mistaken notion that we can and will review her claim de novo.

*1) The fact that M.K. was "medically stable"*

CIGNA's reviewing physicians both determined that, at the time of her admission

15

to Avalon Hills, M.K. was "medically stable." The administrative record overwhelmingly supports these determinations. M.K. was 5'3" tall and, despite her eating disorder, weighed approximately 141.2 pounds and had a resulting BMI of 23.9. Further, her "blood pressure and pulse [we]re with-in-normal [sic] range." SA at 961. Finally, there is no evidence that M.K. suffered from any other medical conditions that necessitated residential treatment or inpatient hospitalization. Notably, both the fact that M.K. was medically stable, and the combination of her weight and BMI, weighed strongly in favor of outpatient care under the APA Level of Care Guidelines.

### 2) M.K.'s suicidal ideation

According to the administrative record, M.K. reported upon her intake at Avalon Hills to having had "constant suicidal ideation for the past four months." Id. at 527. Notably, however, it is undisputed that she had never made any attempts at suicide (at most only scratching herself with her fingernails) and, at the time of her admission to Avalon Hills, did not have in place any "[s]pecific plan." Id. at 878; see id. at 283, 527. All of this information was confirmed by CIGNA on June 8, 2011, when Dr. Patel spoke with Dr. Boghosian of Avalon Hills.

The APA Level of Care Guidelines recommend inpatient hospitalization for a patient with a "[s]pecific plan with high lethality or intent." Id. at 878. The Guidelines also state that "[i]f suicidality is present, inpatient monitoring and treatment may be needed depending on the estimated level of risk." Id. In this case, however, there is no evidence in the administrative record indicating that M.K.'s estimated risk of suicide was

high. As a result, this factor did not weigh heavily, if at all, in favor of residential treatment.

*3) Motivation to recover and intrusive repetitive thoughts*

According to the intake report prepared by M.K.'s counselor at the time of her admission to Avalon Hills, M.K. "ha[d] very low willingness to let go of her eating disorder at th[at] time and poor insight related to the potential negative consequences" of her disorder. Id. at 528. Under the APA Level of Care Guidelines, this factor favored residential treatment.

*4) Co-morbid conditions*

Upon her admission to Avalon Hills, M.K. "me[t] criteria from the Diagnostic and Statistical Manual for Mental Disorders - Text Revision (DSM-IV TR) for Bulimia and Generalized Anxiety Disorder." Id. at 528. M.K.'s "mood ha[d] [also] been low but [was] highly correlated to the onset and worsening of her eating disorder." Id. According to M.K.'s parents, "her mood issues seem[ed] to also correlate with thyroid problems." Id. Finally, M.K. "endorse[d] feelings of worthlessness, problems concentrating, indecisiveness, recurrent passive suicidal ideation, and irritability." Id.

The APA Level of Care Guidelines essentially say two things about the existence of "[c]o-occurring disorders." Id. at 879. First, they state that the "[p]resence of comorbid condition[s] may influence [the] choice of level of care." Id. Second, they state that "[a]ny existing psychiatric disorder that would require hospitalization" would weigh in favor of inpatient hospitalization. Id. The result in this case is that M.K.'s

17

comorbid conditions, none of which required hospitalization, simply did not point strongly in one direction or another in terms of outpatient or residential treatment.

5) *Need for supervision at meals*

Under the APA Level of Care Guidelines, residential treatment is recommended for those patients who "[n]eed[] supervision at all meals or will restrict eating." Id. In M.K.'s case, there was some evidence that she had adopted restrictive eating patterns (e.g., eating only certain types of food). Yet, M.K.'s weight and BMI indicated that she was still consuming sufficient calories to maintain her weight. Further, as we shall discuss more fully below, the evidence indicated that her primary issue was purging after meals. As a result, there is no compelling evidence in the administrative record demonstrating that she was in need of "[s]tructure . . . for eating/gaining weight," id., and this factor therefore did not weigh heavily, if at all, in favor of residential treatment.

6) *Over-exercising*

According to the "Therapist Intake Assessment" that was created at the time of M.K.'s admission to Avalon Hills, "[e]xercise ha[d] played a role in the progression of [her] eating disorder." Id. at 527. M.K.'s parents noted that "she often want[ed] to use their treadmill or go for walks late at night." Id. M.K., by her own admission, "engage[d] in structured strength training routines alone in her room at night," frequently walked around her neighborhood, and went "to a local gym several times per week and work[ed] out for hours" at a time. Id.

A patient's "[a]bility to control compulsive exercising" is not a critical factor

18

under the APA Level of Care Guidelines. Specifically, the Guidelines indicate that patients exhibiting this factor can be placed in anything from "Intensive Outpatient" treatment to "Inpatient Hospitalization," and that this is "rarely a sole indication for increasing [the] level of care." Id. at 879. Consequently, this factor carried little or no weight in M.K.'s case.

*7) Need to inhibit purging*

According to her own reports at the time of admission to Avalon Hills, M.K. was "purging every day via vomiting, laxative, and compensatory exercise." Id. at 528. More specifically, M.K. "admit[ted] to taking approximately 3 laxatives per day" during the "2 years" prior to her admission, and to "purging 3-8 times per day" during the year prior to her admission. Id. at 527.

The APA Level of Care Guidelines indicate that patients exhibiting this factor can be treated in an outpatient setting if they "[c]an greatly reduce [the] incidents of purging in an unstructured setting" and there are "no significant medical complications, such as electrocardiographic or other abnormalities, suggesting the need for hospitalization." Id. at 879. If, however, the patient "[c]an ask for and use support from others or use cognitive and behavioral skills to inhibit purging," then residential treatment is recommended. Id. Finally, inpatient hospitalization is recommended if the patient "[n]eeds supervision during and after all meals and in bathrooms; unable to control multiple daily episodes of purging that are severe, persistent, and disabling, despite appropriate trials of outpatient care." Id.

19

Applying these Guidelines to M.K.'s situation, it was simply unknown whether she was capable of "greatly reduc[ing] [the] incidents of purging in an unstructured setting" for the simple reason that, as both of CIGNA's reviewing physicians effectively noted, she had never undergone any type of outpatient treatment for her eating disorder. Thus, as both of CIGNA's reviewing physicians concluded, this factor favored a trial of outpatient care.

*8) Family conflict*

M.K.'s intake report at the time of her admission at Avalon Hills reflected a fair amount of family conflict. M.K. was the second oldest of seven children, all of whom resided at home. M.K. "reportedly compare[d] herself negatively to her siblings who [we]re all reportedly small in [stature] in comparison to her." Id. at 527. M.K.'s mother was "reportedly diagnosed with bipolar depression and anxiety" and was "taking Cymbalta" at the time of M.K.'s admission. Id. at 528. Although M.K.'s parents were "active members of the LDS church," M.K. had "begun to question her faith" in the six months preceding her admission and "ha[d] become close with a 30 year old uncle (Steven) who ha[d] also left the church." Id. at 527. M.K.'s "parents [we]re very concerned about this relationship and d[id] not approve of contact between [M.K.] and Steven." Id. M.K.'s parents had also "attempted to increase the level of structure in their home," but "believe[d] that [M.K.] ha[d] not responded well to limit setting." Id. For example, her parents "explained that they [had] recently decided not to allow [M.K.] to go on a choir tour due to recent behavior problems," and M.K. "became so angry that she

20

decided to run away." Id. "She went to see her uncle Steven and then stayed with friends for two weeks" and "was only home for one night before" being admitted to Avalon Hills. Id. M.K.'s therapist at the time of her admission described the "family dynamics" as "chaotic." Id. at 528.

The APA Level of Care Guidelines, under the factor heading of "Environmental stress," recommend "Outpatient" or "Intensive Outpatient" treatment if the patient has access to "[o]thers able to provide adequate emotional and practical support and structure." Id. at 880. If the patient has access to "[o]thers able to provide at least limited support and structure," the Guidelines recommend "Full-Day Outpatient Care," otherwise known as "Partial Hospitalization." Id. Finally, the Guidelines recommend residential treatment or inpatient hospitalization for those patients with "[s]evere family conflict or problems or absence of family so patient is unable to receive structured treatment in home" or the "patient lives alone without adequate support system." Id.

Although M.K. argues that her "chaotic" family system weighed in favor of residential treatment, the fact remains that her parents, particularly her father, were supportive of her and interested in seeing her receive treatment. Further, because M.K. had never before received outpatient treatment, it was simply unknown whether her parents could "provide adequate emotional and practical support and structure" to assist her in overcoming her eating disorder. Notably, both of CIGNA's reviewing physicians effectively reached these same conclusions.

21

*9) Availability of local treatment program*

The APA Level of Care Guidelines recommend outpatient treatment of some type if the "[p]atient lives near [the] treatment setting." Id. at 880. On the other hand, the Guidelines recommend residential treatment or inpatient hospitalization if the "[t]reatment program is too distant for [the] patient to participate [in] from home." Id.

In this case, it is undisputed that, prior to her admission to Avalon Hills, M.K. had not received any type of care or treatment for her eating or other disorders. When M.K.'s father initially called CIGNA, he expressly "declined referrals" to available outpatient providers and stated his intent "to continue with Avalon Hills." Id. at 956. There is no evidence in the record that M.K. could not have lived at home and undergone outpatient treatment. Thus, this factor supported the determinations of both of CIGNA's reviewing physicians.

*10) Summary*

Considering all of these factors together, it is apparent that they weighed strongly in favor of outpatient care, at least for a short trial period, and did not support immediate admission for residential treatment.

*B) Dr. Hancock's opinion*

In her appellate brief, M.K. relies heavily on the opinions of Dr. Kyle Hancock. As CIGNA notes in its appellate response brief, M.K.'s parents "commissioned Dr. Hancock's review after [CIGNA]'s initial claim denial presumably for use in the appeal of the claim determination." Aplee. Br. at 31. In the written report that he prepared for

22

M.K.'s parents, Dr. Hancock "strongly recommended that [M.K.] participate in a highly structured, highly supportive, and fully inclusive treatment program designed to provide comprehensive medical and psychological care for [M.K.] and her family."  SA at 874. "Because of the severity, frequency, and duration of [M.K.'s] . . . presenting symptoms," Dr. Hancock "highly recommended that [she] participate in a residential level of care until her symptoms c[ould] be further stabilized."  Id.  In support of these recommendations, Dr. Hancock cited the APA Level of Care Guidelines and asserted that M.K. "me[t] the criteria for nine of the[se] identified guidelines."  Id. at 875. Specifically, Dr. Hancock stated:

1. Medical status: "medically stable to the extent that intravenous fluids, nasogastric tube feedings, or multiple daily laboratory tests are not needed."

2. Suicidality: "If suicidality is present, inpatient monitoring and treatment may be needed depending on the estimated level of risk."

3. Motivation to recover, including cooperativeness, insight, and ability to control obsessive thoughts:

   a. Residential level: "Poor-to-fair motivation; patient preoccupied with intrusive repetitive thoughts 4-6 hours per day; patient cooperative with highly structured treatment."

   b. Inpatient: "Very poor to poor motivation; patient preoccupied with intrusive repetitive thoughts; patient uncooperative with treatment or cooperative only in highly structured environment."

4. Co-occurring disorders: "presence of comorbid condition may influence choice of level of care."

5. Structure needed for eating/gaining weight: "Needs supervision at all meals or will restrict eating."

23

6. Ability to control compulsive exercising: "Some degree of external structure beyond self-control required to prevent patient from compulsive exercising."

7. Purging behavior:

    a. Residential: "Can ask for and use support from others or use cognitive and behavior skills to inhibit purging."

    b. Inpatient: "Needs supervision during and after all meals and in bathrooms; unable to control multiple daily episodes of purging that are severe, persistent, diability [sic], despite appropriate trials of outpatient care, even if routine laboratory test results reveal no obvious metabolic abnormalities."

8. Environmental stress: "Severe family conflict or problems or absence of family so patient is unable to receive structured treatment in home; patient lives alone without adequate support system."

9. Geographic availability of treatment program: "Treatment program is too distant for patient to participate from home."

Id. at 874-75.

Dr. Hancock's analysis of the APA Level of Care Guidelines, as applied to M.K.'s situation, is of questionable value. To begin with, Dr. Hancock did not provide an in-depth discussion of any of these factors. Instead, he simply quoted the language from the Guidelines and suggested that each of the quoted factors favored residential treatment. Further, the record simply does not support Dr. Hancock's analysis. Indeed, as we have discussed at length, only a few of the factors point toward residential treatment, with the remaining factors either being neutral or favoring outpatient treatment.

24

*C) Conclusion*

For the reasons outlined above, we conclude that CIGNA's denial of benefits easily survives review under the arbitrary-and-capricious standard. More specifically, we conclude that CIGNA's reviewing physicians acted reasonably and in good faith in reviewing the information provided by M.K. and Avalon Hills and concluding that residential treatment for M.K. was not "medically necessary" under the terms of the POS Plan.

III

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge